IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-031

Filing Date: July 19, 2011

Docket No. 32,080

LYNETTE CONCHA, ET AL.,

 Petitioners,

v.

HON. SAM B. SANCHEZ,
DISTRICT COURT JUDGE,
EIGHTH JUDICIAL DISTRICT,

 Respondent,

and

STATE OF NEW MEXICO,

 Real Party in Interest.

ORIGINAL PROCEEDING

Jacqueline Cooper, Chief Public Defender
Nancy M. Hewitt, Appellate Defender
T. David Eisenberg, Deputy Public Defender
David A. Bouchard, Deputy Public Defender
Santa Fe, NM

for Petitioners

Gary K. King, Attorney General
David Tourek, Assistant Attorney General
Santa Fe, NM

for Respondent and Real Party in Interest

**OPINION**

1

**DANIELS, Chief Justice.**

**{1}** The extraordinary contempt powers of our courts often require judges to accommodate important, but potentially conflicting, obligations. Judges must take reasonable and necessary steps to maintain the order and safety of our court processes. At the same time, they must comply with fundamental principles of our constitutional system of due process of law to ensure that the judiciary itself does not act lawlessly in the course of enforcing the law. In this Opinion, we address how each of those important obligations should be honored without sacrificing the others.

## I. FACTUAL AND PROCEDURAL HISTORY

**{2}** This case came before us on a petition invoking our emergency original jurisdiction to review the indefinite detention of thirty-two courtroom spectators who had all been summarily ordered to jail for contempt of court by Respondent after a contentious hearing evolved into a courtroom disruption created by some, but not all, of the Petitioners.

**{3}** The underlying hearing related to a criminal case in which a defendant had entered guilty pleas to criminal sexual penetration and criminal sexual contact of a minor, his thirteen-year-old niece. Respondent had sentenced the defendant to six years of imprisonment on each of the two counts, to be served consecutively.

**{4}** On the afternoon of Thursday, November 19, 2009, Respondent heard the defendant's motion for sentence reduction. On the north side of the courtroom's large gallery sat the victim, accompanied by her mother, step-father, grandparents, and a victims' advocate from the district attorney's office. On the east side of the gallery sat Petitioners, many of whom apparently supported a reduced sentence for the defendant. All but one of the Petitioners, who ranged in age from twenty-two to seventy-one years old, were members of Taos Pueblo. The other Petitioner was the defendant's employer. The court had two bailiffs present, and several employees of the district attorney's office also attended the hearing to provide additional security in light of the tensions that existed between the victim's family and the defendant's friends and family.

**{5}** During the reconsideration hearing, four people spoke in support of the defendant's request for a sentence reduction. Three of the victim's family members also spoke and urged Respondent to uphold the sentence. The courtroom remained orderly throughout the witnesses' presentations. At the end of the hearing, Respondent denied the motion to reduce the sentence, emphasizing that the defendant "[was] the adult in this situation," had "destroyed a lot of families," and was "the one to blame" for what had happened. Respondent concluded the hearing by stating that the court was in recess.

**{6}** The events that took place immediately after Respondent recessed the court were preserved in a digital audio recording and supplemented by accounts of some of the persons present. Four seconds after the bailiff announced, "All rise," Respondent, who had left the

2

bench but was still in the courtroom, said, "I want everyone on this side to remain seated," apparently referring to the area in which Petitioners were standing. The defendant responded by saying, "This has all been one sided," and murmurs from unidentified members of the crowd indicated that some of them agreed. Respondent ordered the bailiff to remove the defendant from the courtroom.

{7}     At that point, the noise level in the courtroom increased as the voices of the defendant and some of the spectators became louder. Unidentified voices shouted messages of support to the defendant, such as "We love you," and "Bye." Derogatory statements about the victim and her family were also made, including "she's no virgin," her "grandfather's a rapist," and a reference to "a little whore and a bunch of liars." As the defendant was being led out of the building, the noisy exchange between opposing sides of the courtroom continued in both English and Tiwa, the traditional Taos Pueblo language. The victim and her family were safely escorted through a locked jury room to their car.

{8}     Thirty-nine seconds after the bailiff first told the crowd to rise and while audible statements were still being made, Respondent yelled, "That's enough—I'll hold every one of you in contempt and jail you all!" Although the noise level in the courtroom immediately dropped dramatically, an unidentified voice could be heard saying, "We'll all go." According to an employee of the district attorney's office who was present at the hearing, "[a] gentleman sitting near the front row shouted that he didn't care and they would go to jail." Respondent, who represented at oral argument before this Court that there were "several" unidentified people who stated that they would go to jail, yelled, "You'll all go? Okay, take them all. Go on, all of you, go on to jail!" Respondent asked that the sheriff be called immediately to provide further assistance.

{9}     Moments after Respondent ordered Petitioners to "go on to jail," members of the Taos County Sheriff's Department, Taos Police Department, and New Mexico State Police began to arrive. The officers advised the east gallery spectators that they would be booked and jailed. Respondent left the courtroom and allowed the police officers to process Petitioners, which apparently took place without further incident. One Petitioner was taken to the hospital to be examined for an unrelated health condition. Four of the more elderly Petitioners were incarcerated at the Taos Pueblo jail. Because there was room for only seven Petitioners at the Taos County jail, all of those not locked up in the two Taos area jails were transported to Santa Fe by bus and booked into the Santa Fe County Detention Center.

{10}     The persons arrested were the spectators who had been in the east side of the public area of the courtroom where the defendant's family, friends, and employer were seated. Without any further hearing or fact-finding process, Respondent entered thirty-two identical two-sentence orders that facially adjudicated each Petitioner guilty of direct criminal contempt:

> IT IS HEREBY ORDERED that [name] is held in direct contempt of court for misconduct during a hearing in State of New Mexico v. Dominic Bau, CR-2008-0004 on November 19, 2009. Defendant to be held until further order

3

of the Court.

The orders contained no individualized allegations or findings concerning any individual Petitioner's conduct, no provisions for bond or other conditions of release, no specific sentences, and no settings for any future hearings. The jails were, in effect, ordered to incarcerate each Petitioner until and unless the court issued a future order to the contrary.

{11}  After Respondent summarily ordered Petitioners to jail on Thursday, there was no hearing of any kind held or even scheduled on either Thursday or Friday. Petitioners secured the assistance of counsel, who learned from the court clerk that the only setting in the case was an "arraignment" scheduled for the following Monday at 4 p.m., meaning that Petitioners would have to remain locked in jail without bond for at least four days and nights before having any opportunity to be heard on any issue.

{12}  On the next day, Friday afternoon, Petitioners filed a petition for emergency writ of prohibition or superintending control in this Court, seeking relief from the contempt orders. Late that afternoon, this Court issued a stay of the proceedings against Petitioners, ordered their immediate release from custody, and ordered them to appear before Respondent for the purported "arraignment" hearing on Monday afternoon, November 23.

{13}  At the November 23 district court hearing, instead of conducting arraignments or any further proceedings in the thirty-two contempt cases, Respondent orally announced to Petitioners and their counsel that he was dismissing all contempt proceedings. On the following day he entered a single order, naming all Petitioners as codefendants in a single case, that was as brief and uninformative as the original separate charging orders:

> "THIS MATTER having come before this Court on the 23rd of November, 2009, for Arraignment.
> IT IS THEREFORE ORDERED that this matter is hereby dismissed with prejudice."

{14}  On November 30, Respondent filed in this Court a cursory response to the pending petition for extraordinary relief that did not respond to either the factual or legal allegations in the petition, but instead took the position that "the remaining relief sought in the Petition has become moot" as a result of Respondent's intervening order dismissing the contempt "matter."

{15}  On December 4, we entered an order stating that "this Court d[id] not consider th[e] matter moot" and instructing Respondent "to respond to the questions raised in the petition concerning the appropriateness of contempt and, more generally, the appropriate procedure for a judge to follow when considering contempt for unruly behavior in a courtroom and whether [Respondent] followed that procedure in this case."

{16}  In his filed response to our December 4 order, Respondent took the position that he had used contempt sanctions against all Petitioners, whether guilty or innocent of misconduct, in

4

order to protect the safety of all courtroom occupants and to regain control of the courtroom:

> While it may be true that a small number of Petitioners may not have acted as contemptuously as other Petitioners or contemptuously at all, the Court in acting to protect the safety of all individuals in the courtroom and regain control of the courtroom had to act quickly and did not have the time to separate out a few passive members of the defendant's group that may not have acted contemptuously.

{17}    At the subsequent oral argument before this Court, Respondent represented that his primary goal was to ensure the safety of the victim and her family. He feared that an attack was imminent because "all hell broke loose" in the courtroom at the close of the hearing and there were some members of the crowd who were standing and yelling. Respondent said he was especially concerned because there were no "law enforcement" personnel present at the court and one of the court's two bailiffs was outside the courtroom managing security at the entrance.

{18}    Respondent further explained that he could not tell which members of the crowd were standing or yelling after he ordered all spectators to remain quietly seated. Because he admittedly could not determine which of the thirty-two Petitioners had engaged in contemptuous conduct, he took the position that he had no choice but to arrest all the spectators in the area of the courtroom where the disturbance had taken place. Respondent stated that he had never confronted this type of disturbance in his courtroom and merely did what he thought was necessary to regain control of the situation.

{19}    Respondent further represented to this Court that he had intended to dismiss the contempt orders and release Petitioners on the Friday after they were jailed, despite Petitioners' counsel's inconsistent assertion that, when Petitioners served their extraordinary writ petition on Respondent on that same Friday afternoon, Respondent stated, "You guys didn't have to do that. I was going to release them on Monday." When asked by this Court why he would have planned to dismiss charges against all Petitioners without following through on his criminal contempt orders, Respondent stated:

> I didn't look at it as guilt or non-guilt. . . . I didn't look at it as finding anyone having conducted anything that was going to result in any jail sentence except that I had to control the crowd at that time.

{20}    At the conclusion of our writ hearing, and with the concurrence of all parties and counsel, this Court ordered the contempt convictions vacated and Petitioners' arrest and booking records expunged. In this follow-up Opinion, we address the reasons why we issued our writ and discuss the interrelated issues of contempt powers and limitations, courtroom control, and due process of law.

**II. DISCUSSION**

## A. Source and Nature of Contempt Powers

**{21}** We begin by recognizing the indisputable authority of judges to compel obedience to their orders and to maintain the decorum and safety of their courtrooms.

**{22}** Pursuant to NMSA 1978, Section 34-1-2 (1851), all New Mexico courts have the power to "preserve order and decorum, and for that purpose to punish contempts by reprimand, arrest, fine or imprisonment, being circumscribed by the usage of the courts of the United States." "This statute is declaratory of the common law." *In re Klecan*, 93 N.M. 637, 638, 603 P.2d 1094, 1095 (1979).

**{23}** Even in the absence of express statutory authority, "courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect and decorum in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 19 U.S. 204, 227 (1821). While statutes may provide reasonable regulatory measures, the Legislature may not "substantially impair or destroy the implied power of the court to punish for contempt." *State ex rel. Bliss v. Greenwood*, 63 N.M. 156, 162, 315 P.2d 223, 227 (1957).

**{24}** The exercise of the contempt power and the conduct it is intended to address may take various forms. "Contempts of court are classified as civil or criminal. . . . The major factor in determining whether a contempt is civil or criminal is the purpose for which the power is exercised." *In re Klecan*, 93 N.M. at 638, 603 P.2d at 1095. Criminal contempts are further delineated "as direct or indirect." *Id.* at 638, 603 P.2d at 1095. "Direct contempts are contemptuous acts committed in the presence of the court, while indirect [contempts] are such acts committed outside the presence of the court." *Id.* at 639, 603 P.2d at 1096.

**{25}** Civil contempts are remedial and may use fines, imprisonment, or other sanctions as coercive measures to compel the contemnor to comply in the future with an order of the court. *See State ex rel. Apodaca v. Our Chapel of Memories of N.M., Inc.*, 74 N.M. 201, 204-05, 392 P.2d 347, 349-50 (1964). Because the purpose of those civil contempt sanctions is to compel compliance with the court's orders and not to punish, the continuing contempt sanctions end when the contemnor complies. A civil contempt defendant "carries the keys of his prison in his own pocket. He can end the sentence and discharge himself of contempt at any moment by doing what he has previously refused to do." *State v. Pothier*, 104 N.M. 363, 364, 721 P.2d 1294, 1295 (1986) (internal quotation marks and citation omitted). Civil contempt sanctions may be imposed by honoring the most basic due process protections—in most cases, fair notice and an opportunity to be heard. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see Turner v. Rogers*, ___ U.S. ___, ___, 131 S. Ct. 2507, 2520 (2011) (holding that constitutional due process in civil contempt proceedings requires notice and a hearing but not the right to counsel).

**{26}** Criminal contempt proceedings are instituted to punish completed acts of disobedience that have threatened the authority and dignity of the court and are appropriate even after the contemnor is no longer acting contemptuously. *Bagwell*, 512 U.S. at 828-29. Both this Court

6

and the United States Supreme Court have long recognized that "'[c]riminal contempt is a crime in the ordinary sense; it is a violation of the law.'" *Pothier*, 104 N.M. at 365, 721 P.2d at 1296 (alteration in original) (quoting *Bloom v. Illinois*, 391 U.S. 194, 201 (1968)). A criminal contempt defendant is therefore entitled to due process protections of the criminal law, the specific nature of which will depend on whether the criminal contempt is categorized as direct or indirect. No matter how a criminal contempt is characterized, it is a "fundamental proposition that criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings, including the requirement that the offense be proved beyond a reasonable doubt." *Hicks v. Feiock*, 485 U.S. 624, 632 (1988).

**{27}** A person who commits disruptive or defiant conduct in the midst of an ongoing court proceeding within the personal perception of the judge has committed an act of direct criminal contempt and may be punished summarily without further evidentiary proceedings. *See, e.g.*, *Purpura v. Purpura* (*In re Cherryhomes*), 115 N.M. 80, 81-82, 85, 847 P.2d 314, 315-16, 319 (Ct. App. 1993) (upholding a finding of contempt where an attorney disobeyed the judge's direct orders, attempted to leave the court room before the hearing had finished, and pushed the sheriff's deputy who was attempting to restrain him). If feasible, even in summary proceedings for an act of direct contempt occurring in open court, an "adequate opportunity to defend or explain one's conduct is a minimum requirement before imposition of punishment." *In re Klecan*, 93 N.M. at 639, 603 P.2d at 1096 (internal quotation marks and citation omitted) (reversing a direct contempt citation for failure of the judge to permit the contemnor to explain his conduct).

**{28}** When the judge has not personally witnessed the defendant's contemptuous behavior in the course of a court proceeding, the contempt is classified as indirect criminal contempt and must be resolved through more traditional due process procedures. *State v. Stout*, 100 N.M. 472, 474, 672 P.2d 645, 647 (1983) (holding that an attorney charged with contempt for failing to attend a scheduled hearing could be charged only with indirect, not direct, contempt because the contempt did not occur in open court and the judge did not have personal knowledge of the reasons for the attorney's nonappearance).

**{29}** The contempt power of a court is so broad that it is uniquely "'liable to abuse.'" *Bloom*, 391 U.S. at 202 (quoting *In re Terry*, 128 U.S. 289, 313 (1888)). As human beings, judges "'sometimes exhibit vanity, irascibility, narrowness, arrogance, and other weaknesses to which human flesh is heir.'" *Id.* at 202 n.4 (quoting *Sacher v. United States*, 343 U.S. 1, 12 (1952)). Contumacy "often strikes at the most vulnerable and human qualities of a judge's temperament." *Id.* at 202. Not only is a judge often personally involved to some degree in the conflict that must be adjudicated, the same judge exercises several responsibilities normally assigned to separate persons or institutions: "That one and the same person should be able to make the rule, to adjudicate its violation, and to assess its penalty is out of accord with our usual notions of fairness and separation of powers." *Bagwell*, 512 U.S. at 840 (Scalia, J., concurring).

**{30}** Because we necessarily give judges such extraordinary unilateral powers, this Court

7

repeatedly has cautioned that we must require judges to exercise a correspondingly extraordinary self-restraint to avoid abuses of those powers. *See, e.g.*, *Pothier*, 104 N.M. at 369, 721 P.2d at 1300 (explaining that, in exercising the contempt power, a court "should not exercise more than the least possible power adequate to the end proposed"); *Case v. State*, 103 N.M. 501, 503, 709 P.2d 670, 672 (1985) ("It is the responsibility of the judiciary to exercise that power wisely and always within its limitations."); *Int'l Minerals & Chem. Corp. v. Local 177, United Stone & Allied Prods. Workers*, 74 N.M. 195, 200, 392 P.2d 343, 346 (1964) (explaining that contempt power must be used "cautiously and sparingly").

**{31}** We now examine Respondent's actions in this case to determine whether they constituted a lawful exercise of judicial power. In doing so, we must first determine what kind of contempt power was exercised by Respondent and then consider whether he acted within the bounds of his lawful discretion.

**B. The Commitment Orders Were Not Civil Contempt Because Petitioners Could Not Obtain Release from Jail by Compliance with the Orders.**

**{32}** In determining the proper classification of a contempt order as criminal or civil, we look to "the nature and purpose of the punishment, rather than the character of the acts to be punished, as a controlling factor." *Int'l Minerals & Chem. Corp.*, 74 N.M. at 198, 392 P.2d at 345. Respondent's written orders, which state that Petitioners were being "held in direct contempt," reflect that Respondent intended to impose criminal sanctions. Although we are not bound by Respondent's characterization of the civil or criminal nature of the action he was taking, we agree that his orders were in the nature of criminal contempt.

**{33}** Whatever contemptuous conduct any of the Petitioners allegedly had been engaged in before Respondent summarily ordered all to jail, whether sitting when the bailiff told them to rise, or standing when Respondent then told them to sit back down, or talking when he wanted them to be quiet, there was nothing in the oral or written contempt orders that gave any of the Petitioners the ability to "end the sentence and discharge [themselves] of contempt at any moment by doing what [they had] previously refused to do." *Pothier*, 104 N.M. at 364, 721 P.2d at 1295. In the terms of our caselaw, none of them carried the keys of their prisons in their own pockets. *See Our Chapel of Memories of N.M., Inc.*, 74 N.M. at 205, 392 P.2d at 350.

**{34}** Indeed, the record reflects that whoever had been acting in any disruptive or disobedient manner had ceased doing so immediately upon Respondent's oral pronouncement that he was sending everyone to jail, before a single written contempt order was prepared. At that point, there was no need for any further crowd control or imposition of civil contempt sanctions. Petitioners clearly were jailed for the past behavior of one or more of them and not as a coercive measure to stop any continuing disorderly or disobedient behavior. "Where a contempt sanction is punitive, not remedial, the proceeding is one of criminal contempt." *Beverly v. Beverly*, 2000-NMCA-097, ¶ 8, 129 N.M. 719, 13 P.3d 77 (internal quotation marks and citation omitted). Because Petitioners were ordered jailed without regard to their future conduct, we must analyze Respondent's actions by established rules of law applicable to punitive criminal

contempt proceedings.

**C. Summary Direct Criminal Contempt Proceedings Were Inappropriate Because the Judge Did Not Have Personal Knowledge of Any Petitioner's Guilt.**

{35} The thirty-two identical contempt orders and jail commitments entered by Respondent specifically recited that he was holding each Petitioner in direct criminal contempt. But the due process shortcuts of summary direct contempt proceedings are permitted only in exceptional circumstances:

> Except for a narrowly limited category of contempts, due process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential . . . .

*State v. Diamond*, 94 N.M. 118, 121, 607 P.2d 656, 659 (Ct. App. 1980) (first alteration in original) (emphasis omitted) (internal quotation marks omitted) (quoting with approval *In re Oliver*, 333 U.S. 257, 275 (1948)).

{36} Although an immediate need to control courtroom misconduct may justify quick action of some kind, one of the necessary bases for dispensing with normal due process fact-finding protections before criminal conviction and punishment may be imposed is "the personal knowledge of the judge" as to the defendant's guilt. *Id.* at 120-21, 607 P.2d at 658-59. Since the earliest days of the common law, Anglo-American courts have recognized that where determination of guilt or innocence requires a "'confession of the party or the testimony of others'" to supplement the judge's incomplete personal observations, the summary procedures of direct contempt are inappropriate. *In re Terry*, 128 U.S. at 307 (quoting 4 William Blackstone, *Commentaries* *286).

{37} In this case, the judge concededly had no personal knowledge of the guilt or innocence of any single one of the thirty-two courtroom spectators he sentenced to jail. In a striking perversion of the "overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime," Respondent entered orders that essentially inflicted on each Petitioner an irrebuttable presumption of guilt. *State v. Ortega*, 112 N.M. 554, 562, 817 P.2d 1196, 1204 (1991) (emphasis omitted) (internal quotation marks and citation omitted), *abrogated on other grounds by State v. Frazier*, 2007-NMSC-032, ¶¶ 1, 31, 142 N.M. 120, 164 P.3d 1. In convicting and jailing Petitioners without having judicial knowledge of their guilt, Respondent unlawfully used the summary processes of direct criminal contempt. If he had

9

wished to pursue contempt actions against any or all Petitioners, the only lawful avenue would have been through non-summary indirect criminal contempt proceedings where their guilt or innocence could be properly determined.

**{38}** We now consider whether his actions could be justified as a proper exercise of indirect criminal contempt powers.

**D. The Due Process Protections of Indirect Criminal Contempt Proceedings Were Not Honored.**

**{39}** The explicit language of the brief contempt orders, reciting that each Petitioner had already been "held in direct contempt of court," reflected that criminal convictions had already been entered, with nothing left to be adjudicated. Those orders cannot be reconciled with the scheduling of an "arraignment" on the charges several days later. An arraignment is "[t]he initial step in a criminal prosecution whereby the defendant is brought before the court to hear the charges and to enter a plea." *Black's Law Dictionary* 123 (9th ed. 2009). But any further contempt proceedings would have been barred by our constitutional protections against double jeopardy after Petitioners already had been found in criminal contempt for the same behavior. *State v. Driscoll*, 89 N.M. 541, 546-47, 555 P.2d 136, 141-42 (1976) (holding that further contempt proceedings after a lawyer was summarily jailed for contempt in open court would constitute double jeopardy).

**{40}** Even if we construe the contempt orders as indirect contempt findings, Respondent also failed to honor any of the due process protections required in non-summary indirect contempt prosecutions. The contempt orders provided no fair notice of each Petitioner's allegedly contemptuous behavior. *See Norton v. Reese*, 76 N.M. 602, 605, 417 P.2d 205, 207 (1966) (observing that a contempt defendant has a right under Article II, Section 14 of the New Mexico Constitution to be given notice of "the nature and cause" of the criminal accusation). The findings were not based on any evidence at all, admissible or inadmissible. *See* Rule 11-1101(B) NMRA (providing that the New Mexico rules of evidence apply in all "contempt proceedings except those in which the court may act summarily"). Petitioners were given no opportunity to prepare or present any defense. *See Pothier*, 104 N.M. at 366, 721 P.2d at 1297 (observing that due process of law in indirect contempt cases requires an opportunity to present a defense). They were not afforded their constitutional right to the assistance of counsel, either appointed or retained. *See State v. Montoya*, 1998-NMCA-149, ¶ 5, 126 N.M. 273, 968 P.2d 784. They were held indefinitely without any opportunity to be released on bail, in violation of Article II, Section 13 of the New Mexico Constitution and Rule 5-401 NMRA.

**{41}** Respondent lawfully could have initiated indirect contempt proceedings against those individuals whom he had reason to believe were participating in disruptive or defiant conduct, but he was required to honor the procedures of the law and the limits of constitutional due process. In this case, he utterly failed to do so.

**E. The Need for Courtroom Control Cannot Override the Requirement That Judges**

10

**Themselves Must Honor the Rule of Law.**

**{42}** We address one final point with regard to Respondent's exercise of the court's contempt powers. Respondent has argued from the outset of these proceedings that, notwithstanding his convicting Petitioners of direct criminal contempt and ordering them jailed indefinitely, his goal had been courtroom control and not punishment. But judges above all others in our society must honor the fundamental principle that a desirable end cannot justify means that violate the law. The contempt power has always been viewed as a lawful tool in achieving courtroom control. But it is not the only tool available, and it normally need not be the first to be used. A clear admonition of what is expected by a judge, coupled with a specific warning of the alternative of contempt sanctions, often can achieve control without resort to a collateral contempt prosecution. Our courts have recognized the importance of such clear warnings in a number of published opinions:

> [E]xcept in cases of flagrant contemptuous conduct, before summary punishment for contempt may be imposed and enforced, the record should be clear that: (1) a specific warning was given by the judge; (2) an opportunity to explain was afforded, and (3) a hearing was held.

*In re Klecan*, 93 N.M. at 640, 603 P.2d at 1097 (internal citations omitted); *see also In re Herkenhoff*, 1997-NMSC-007, 122 N.M. 766, 769, 931 P.2d 1382, 1385 (citing with approval the prior warning caution of *In re Klecan*); *In re Byrnes*, 2002-NMCA-102, ¶ 16, 132 N.M. 718, 54 P.3d 996 (emphasizing that "[w]ithout a clear prior warning, it is improper for a judge to act summarily in issuing a contempt order").

**{43}** Respondent's warnings of what he expected of the spectators lacked the clarity required either by our caselaw or by the need to achieve courtroom control without resorting to contempt sanctions. The hearing had recessed when Respondent countermanded the bailiff's instruction for the spectators to stand and told them to be seated. Respondent never told the spectators that they could not speak. He certainly never effectively communicated to any of the spectators, collectively or individually, that standing or speaking would result in contempt citations or jail. His single reference to the possibility of contempt sanctions before ordering an entire group of spectators to jail was when he yelled, "That's enough—I'll hold every one of you in contempt and jail you all!" If he had simply stated that anyone who did not sit down or anyone who continued talking would be jailed for contempt, he probably would have achieved the control that he did just seconds later when he yelled, "You'll all go? Okay, take them all. Go on, all of you, go on to jail!" And if he had made reasonable efforts to identify the person or persons who stated their willingness to go to jail, he could have avoided sweeping up the innocent with the guilty.

**{44}** The record before us makes it clear that Respondent had achieved complete courtroom control within less than a minute from the initiation of the disturbance, at the moment he orally announced he was sending Petitioners to jail. At that point, there was no courtroom control to be achieved by going further and convicting or jailing anyone, and there certainly was no lawful

11

justification for jailing innocent and guilty alike or disregarding the most fundamental requirements of due process.

{45} We stress that nothing in our Opinion should suggest that a judge may not hold a disruptive audience member in contempt of court. But in holding a person in contempt, a court must honor the rule of law. A judge's exercise of the contempt power must be tailored to the contemptuous conduct, exerting just enough judicial power to right the wrong; no more, no less. "[I]n selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed.'" *Spallone v. United States*, 493 U.S. 265, 276 (1990) (internal quotation marks and citation omitted). Not only was Respondent's mass jailing of all thirty-two occupants of a public section of a courtroom, without any due process or determination of personal guilt, not the least power necessary to control the courtroom, it constituted such a uniquely egregious abuse of a court's contempt power that our research has found no comparable occurrence in any jurisdiction in the history of American law.

**F. The Extraordinary Circumstances of This Case Called for the Exercise of This Court's Original Writ Jurisdiction.**

{46} The arrests, convictions, and continued detentions of Petitioners were a clear and continuing abuse of judicial power that called for this Court's exercise of our original writ jurisdiction. Criminal contempt convictions may be routinely reviewed on appeal for arbitrariness and abuse of discretion. *Case*, 103 N.M. at 503, 709 P.2d at 672. But despite the technical availability of an ordinary appeal, this Court has long recognized that our superintending control jurisdiction under Article VI, Section 3 of the New Mexico Constitution "will be exercised if the remedy by appeal is wholly or substantially inadequate, or if the exercise thereof will prevent irreparable mischief, great, extraordinary or exceptional hardship, costly delays, or unusual burdens in the form of expenses." *State ex rel. DuBois v. Ryan*, 85 N.M. 575, 577, 514 P.2d 851, 853 (1973); *see also State ex rel. N.M. Press Ass'n v. Kaufman*, 98 N.M. 261, 265, 268, 648 P.2d 300, 304, 307 (1982) (granting Article VI, Section 3 writ of prohibition where a district court's order limiting media coverage of a trial could not be justified as "a valid exercise of judicial power under any legal theory").

{47} Given the extraordinary request for immediate judicial relief presented to us in this case by thirty-two people jailed indefinitely without any semblance of due process, for this Court to have remained idle, waiting for routine appellate processes to have worked their course, would have seriously compounded the ongoing grave injustice being committed by a court subject to our superintending control. We therefore granted the requested emergency relief.

**III.   CONCLUSION**

{48} Respondent's convictions and jail sentences of Petitioners were an unlawful abuse of judicial power requiring this Court's orders that Petitioners be released from jail and that their criminal contempt convictions be vacated. We reaffirm our contemporaneous orders to that effect.

12

**{49}     IT IS SO ORDERED.**

_____

**CHARLES W. DANIELS, Chief Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

**Topic Index for _Concha v. Sanchez_, Docket No. 32,080**

| | |
|---|---|
| **CE** | **CONTEMPT** |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| | |
| **JG** | **JUDGES** |
| JG-JA | Judicial Authority |
| JG-PC | Propriety of Conduct |
| | |
| **RE** | **REMEDIES** |
| RE-CC | Civil Contempt |
| RE-CR | Criminal Contempt |