This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-39307**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.

**MARK TIMOTHY HICE,**

    Defendant,

**IN RE SHERI A. RAPHAELSON,**

    Attorney-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Maria Sanchez-Gagne, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Meryl E. Francolini, Assistant Attorney General
Albuquerque, NM

for Appellee

Michael L. Stout
Las Cruces, NM

for Appellant

### MEMORANDUM OPINION

**HENDERSON, Judge.**

**{1}**    The district court held attorney Sheri Raphaelson in direct criminal contempt for violating court-mandated COVID-19 screening protocols that restricted access to the courthouse. Raphaelson appeals, arguing the district court erred by using summary

procedures reserved for direct contempt because any contempt was in fact indirect, and that additional procedures would reveal insufficient evidence to support her contempt conviction. Because we are persuaded that Raphaelson was at most in indirect contempt of court, the district court's summary adjudication and punishment was inappropriate. We reverse and vacate Raphaelson's conviction.[1]

## BACKGROUND

**{2}** Jury selection for Raphaelson's client commenced on July 13, 2020. At the time, our Supreme Court's emergency court protocols governing the continued operation of the judiciary during the global COVID-19 pandemic were in effect. *See* Supreme Court Order No. 20-8500-025 (July 6, 2020).[2] The First Judicial District Court, in which the trial was to take place, instated a reopening plan that required any person entering the courthouse to answer health screening questions designed to limit the spread of COVID-19. One of those questions asked whether the person had come in contact with a confirmed-positive case of COVID-19 in the last fourteen days. If they answered yes, that person would not be permitted in the courthouse. With those restrictions in place, jury selection began as scheduled. However, during a recess in the afternoon, Raphaelson told opposing counsel that eleven days earlier she had come in contact with someone who tested positive for COVID-19.

**{3}** Opposing counsel informed the judge of Raphaelson's statement once proceedings resumed, outside the presence of the jury. The judge asked if this was true, and Raphaelson admitted her contact. Raphaelson endeavored to explain her presence in the courthouse by arguing that she was asked the COVID-19 screening questions by a courthouse deputy, and that she informed him of her exposure but was allowed to enter the courthouse nonetheless. She also questioned the screening deputy's ability to adequately screen members of the public.

**{4}** The judge asked Raphaelson why she waited until so late in the day to disclose to the judge that she had come in contact with the disease, noting that it was Raphaelson's personal responsibility not to enter the courthouse. Raphaelson disagreed and said that she felt no obligation to disclose her contact to the judge personally. She contended that it was the courthouse deputies' obligation to deny her access to the courthouse and inform the judge, rather than her own responsibility after she had "answered every question [she] was supposed to." Raphaelson further stated that she did not believe she was positive for COVID-19 or had placed anyone at risk by her presence.

---

1We have no opinion at this time on whether Raphaelson may properly be found to be in indirect contempt on remand.

2Order, *In the Matter of the Safe and Effective Administration of the New Mexico Judiciary During the COVID-19 Public Health Emergency*, No. 20-8500-025 (N.M. July 6, 2020), https://www.nmcourts.gov/wp-content/uploads/2020/12/Order-No_-20-8500-025-Order-Adopting-PHE-Protocols-for-Safe-and-Effective-Operation-of-NM-Courts-7-6-20-with-PHE-Protocols-Attached-1.pdf.

**{5}** The judge called another recess so she could decide how to address the situation. When proceedings resumed, the judge questioned courthouse staff regarding Raphaelson's entry to the courthouse. The deputy who screened Raphaelson testified under oath that Raphaelson told him she had contact with someone who tested positive for COVID-19, but her contact was beyond fourteen days, and she had not tested positive herself. A second deputy who was standing nearby when Raphaelson was screened corroborated the events described by the screening deputy. Finally, the jury division supervisor testified that COVID-19 postings were hung throughout the courthouse, including in front of the building, which advised that if a person had "recently been exposed to someone with COVID-19" they could not enter. Raphaelson was afforded but declined the opportunity to question the courthouse staff.

**{6}** Following the staff's testimony, Raphaelson addressed the court directly. She did not deny her contact, but explained that based on her personal evaluation, she had not been "exposed" to COVID-19 because of her use of personal protective equipment. According to Raphaelson, the only reason she had told the screening deputy about her contact with the disease was because she wanted to be "as honest as [she] possibly could be." She then criticized the fact that courthouse staff, instead of medical professionals, were charged with screening for COVID-19. Raphaelson indicated that had she been "exposed" based on her definition, then she would have isolated and tested for the disease. The only testimony from the courthouse staff that Raphaelson denied was that she had been tested for COVID-19 or that she had told the deputies she had tested negative.

**{7}** The judge stressed the seriousness of the situation and her concern regarding how long it took before the alleged exposure was disclosed to her. She disagreed with Raphaelson that it was solely the deputies' obligation to inform the judge of an exposure, and as an officer of the court, Raphaelson had an independent duty to do so. The judge expressed that, regardless of whether Raphaelson had been exposed or if her contact had occurred beyond fourteen days, Raphaelson had an obligation to disclose any contact earlier in the day, and having not done so she had wasted court resources and risked the health of others. The judge accordingly held Raphaelson in contempt and sanctioned her.

**{8}** Raphaelson immediately asserted that the judge "failed to follow the rules for contempt," arguing that any contempt was indirect and cannot be sanctioned with summary adjudication. Opposing counsel responded that Raphaelson was in direct contempt due to her presence in the courthouse despite her potential exposure. The judge clarified that she was holding Raphaelson in direct contempt based on her failure to disclose, regardless of whether Raphaelson believed she was actually exposed to COVID-19. One week later, the district court entered a written order concluding that Raphaelson's conduct was flagrant and contumacious amounting to direct criminal contempt and could be sanctioned summarily under Rule 5-112(C) NMRA (2016,

suspended 2021).[3] The district court ordered Raphaelson to pay a $1,000 fine, plus the cost of jury services in the amount of $2,580.60, for a total of $3,580.60.

**{9}** Raphaelson retained counsel and filed a motion to withdraw the order. She renewed her argument that her conduct was not contumacious, and even if it was, the conduct did not amount to direct contempt because it was not "committed in the immediate presence of the [district c]ourt and was not personally observed by the judge," and "the [district c]ourt conducted further fact-finding." Raphaelson once again asserted that "indirect [criminal] contempt require[d] procedures that were not met in [her] case." The State filed a response arguing that Raphaelson's conduct amounted to direct criminal contempt by violating the Supreme Court's orders and the local reopening plan, and thus, was punishable summarily under Rule 5-112(C). After a hearing, the district court denied Raphaelson's motion, and this appeal followed.

**DISCUSSION**

**{10}** New Mexico courts have inherent power to punish for contempt. *State ex rel. Bliss v. Greenwood*, 1957-NMSC-071, ¶ 17, 63 N.M. 156, 315 P.2d 223. The power is described in NMSA 1978, Section 34-1-2 (1851) as the power to "preserve order and decorum, and for that purpose to punish contempts by reprimand, arrest, fine or imprisonment, being circumscribed by the usage of the courts of the United States." *See In re Klecan*, 1979-NMSC-094, ¶ 4, 93 N.M. 637, 603 P.2d 1094 (recognizing that Section 34-1-2 is "declaratory of the common law" power of contempt). Because the decision to exercise the contempt power lies within the discretion of the judge, on appeal we review only for abuse of that discretion. *See Concha v. Sanchez*, 2011-NMSC-031, ¶¶ 30-31, 150 N.M. 268, 258 P.3d 1060; *id.* ¶ 46 ("Criminal contempt convictions may be routinely reviewed on appeal for arbitrariness and abuse of discretion."). "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *In re Contempt of Maestas*, 2022-NMCA-057, ¶ 13, 517 P.3d 942 (internal quotation marks and citation omitted). We are mindful, however, of the "extraordinary unilateral [contempt] powers" possessed by courts, and reiterate our Supreme Court's repeated words of caution that judges are to "exercise a correspondingly extraordinary self-restraint to avoid abuses of those powers." *Concha*, 2011-NMSC-031, ¶ 30.

**{11}** We begin by briefly discussing whether the contempt in this case was criminal or civil, because civil contempt requires only "the most basic due process protections—in most cases, fair notice and an opportunity to be heard." *Id.* ¶ 25. Concluding that the contempt imposed was criminal, we next discuss whether the contempt was direct or

---

3We refer to the 2016 version of Rule 5-112(C) in this opinion as the underlying events occurred in 2020, prior to our Supreme Court suspending the rules for criminal contempt in 2021. Order, *In the Matter of the Suspension of the Rules Governing Criminal Contempt Proceedings in New Mexico State Courts*, 21-8300-032 (N.M. Nov. 22, 2021), https://supremecourt.nmcourts.gov/wp-content/uploads/sites/3/2021/11/Order-No.-21-8300-032-1.pdf. Likewise, following our Supreme Court's recent opinion *In re Marshall*, 2023-NMSC-009, 528 P.3d 670 (per curiam), we now regard this charge as indirect "punitive" contempt. *See id.* ¶ 23. In this opinion, we refer to the conviction as criminal contempt as that was the charged offense under the rule in effect at that time.

indirect, the former of which may be punished summarily without further evidentiary proceedings. Rule 5-112(C).

## I.       Criminal or Civil Contempt

**{12}**   The district court's order sanctioned Raphaelson for criminal contempt based on her failure to disclose her COVID-19 contact and entering the courthouse in violation of our Supreme Court's order, or alternatively for misleading the district court that her contact occurred within fourteen days. We are not bound by the district court's characterization of Raphaelson's contempt, and *Concha* calls for an examination of the type of contempt used in order to determine if the process due was given. *See* 2011-NMSC-031, ¶ 32. However, both parties appear to agree that the contempt in this case was criminal in nature, and we agree as well.

**{13}**   "The major factor in determining whether a contempt is civil or criminal is the purpose for which the power is exercised." *Id.* ¶ 24 (internal quotation marks and citation omitted). If the punishment is remedial "to coerce [a] defendant to perform the act ordered by the court," then the contempt is civil. *State v. Pothier*, 1986-NMSC-039, ¶ 4, 104 N.M. 363, 721 P.2d 1294. In such instances, a defendant "can end the sentence and discharge [themselves] of contempt at any moment by doing what [they have] previously refused to do." *Id.* If the punishment is instead punitive, "to vindicate the authority of the court," the contempt is criminal. *Id.* "Criminal contempt proceedings are instituted to punish completed acts of disobedience that have threatened the authority and dignity of the court and are appropriate even after the contemnor is no longer acting contemptuously." *Concha*, 2011-NMSC-031, ¶ 26.

**{14}**   Here, nothing about the district court's order indicates that it was attempting to coerce Raphaelson to comply with our Supreme Court's order in the future. Raphaelson was further without the ability to cease any misconduct and thereby discharge herself of contempt. *See State ex rel. Child., Youth & Fams. Dep't v. Mercer-Smith*, 2019-NMSC-005, ¶ 27, 434 P.3d 930 (concluding that the judge did not impose civil contempt, in part because the contemnor was not being coerced into complying with a court order). Rather, the district court believed that Raphaelson was in violation of COVID-19 restrictions by being present in the courthouse and had failed to disclose pertinent information about her potential exposure. The purpose of the contempt proceedings was to punish Raphaelson for those completed acts and vindicate that court's authority, and therefore criminal in nature.

## II.      Indirect or Direct Contempt

**{15}**   Criminal contempt is "a crime in the ordinary sense; it is a violation of the law." *Concha*, 2011-NMSC-031, ¶ 26 (internal quotation marks and citation omitted). A person facing criminal contempt is owed the same due process protections as any other criminal defendant. *Id.* Those protections vary, however, depending on whether the contempt is categorized as direct or indirect. *Id.* "*Direct contempt* is contemptuous conduct in the presence of the court, and *indirect contempt* is an act committed outside

the presence of the court." *Pothier*, 1986-NMSC-039, ¶ 8. Direct contempt permits "due process shortcuts" and allows the judge to punish the contemnor summarily. *Concha*, 2011-NMSC-031, ¶ 35; *see also* Rule 5-112(C) ("A direct criminal contempt may be punished summarily at the time of the contempt without further evidentiary proceedings."). Even then, the judge must provide a warning to the contemnor, prior to punishment, that they must cease their behavior, and give them an opportunity to explain their conduct—except in cases of "flagrant contemptuous conduct." Rule 5-112(C). By contrast, "[i]n indirect [contempt] proceedings where the judge has not personally witnessed the defendant's contumacious actions, the contempt must be resolved through more traditional due process procedures." *In re Contempt of Maestas*, 2022-NMCA-057, ¶ 16 (internal quotation marks and citation omitted).

**{16}**   The question in this case is whether a person is in direct contempt when their conduct is in the physical presence of the court, but the court lacks the knowledge necessary to determine that the conduct is in fact contemptuous. Our case law clearly answers the question in the negative, but that answer is somewhat obscured by the phrases courts typically use to distinguish direct and indirect contempt. Whether contempt is direct or indirect depends on if it occurs "in the presence of the court." *Pothier*, 1986-NMSC-039, ¶ 8. In *State v. Diamond*, this Court noted how "presence need not be physical presence," but that such a construction creates a "problem of semantics" that implies direct contempt requires personal knowledge of the judge and not "presence" per se. 1980-NMCA-026, ¶ 8, 94 N.M. 118, 607 P.2d 656. The Court in *Diamond* did not resolve that tension, because it determined that regardless of whether direct contempt requires "presence" or the judge's knowledge, both were absent in that case. *Id.* ¶ 9.

**{17}**   This tension was resolved in *Concha* when our Supreme Court affirmatively held that a judge must have personal knowledge of the alleged contemnor's guilt to hold them in direct contempt. 2011-NMSC-031, ¶ 36. As such, in that case even though each person held in contempt was in the literal presence of the judge, *see id* ¶ 4, the judge could not hold each of them in direct contempt because he "had no personal knowledge of the guilt or innocence of any single one of the thirty-two courtroom spectators he sentenced to jail." *Id.* ¶ 37. Based on *Concha*, a judge must have personal knowledge of the alleged contemnor's guilt, and if they lack that knowledge, direct contempt is inappropriate, even if the underlying conduct occurs in their presence.

**{18}**   This principle is illustrated by cases that demonstrate how a contemnor's guilt may still be in question even when the misconduct occurs in open court. In *State v. Stout*, an attorney was unable to attend his client's sentencing hearing and had arranged for someone else to appear for him. 1983-NMSC-094, ¶¶ 4-5, 100 N.M. 472, 672 P.2d 645. However, the attorney did not inform the district court of his absence, and when the attorney failed to appear, the district court ordered him to explain at a hearing why he should not be held in contempt. *Id.* ¶ 5. Instead of offering an explanation, the attorney argued that certain due process protections were not met. *Id.* The district court nevertheless held the attorney in contempt. *Id.* ¶ 6. Our Supreme Court reversed, holding that any misbehavior was indirect contempt because the judge had no

knowledge of the reasons for the attorney's absence—even though that absence was self-evident to the judge. *See id.* ¶¶ 8-9; *Concha*, 2011-NMSC-031, ¶ 28; *see also Diamond*, 1980-NMCA-026, ¶¶ 2, 9, 15, 16 (reversing a direct contempt conviction of an attorney who failed to appear when ordered by the district court).

**{19}**   In *Lopez v. Maes*, a defendant in a paternity suit denied that he was the father to a child, but a jury ultimately determined that he was, and the defendant was ordered to pay child support. 1934-NMSC-075, ¶ 1, 38 N.M. 524, 37 P.2d 240. After a hearing, he was held in contempt for his failure to comply with the judgment and jailed. *Id.* As part of its contempt order, the district court stated that the defendant had lied by denying paternity because the jury's finding to the contrary was "amply warranted" based on the evidence. *Id.* In reversing the defendant's conviction, our Supreme Court noted that perjury may be addressed through the district court's contempt power. *Id.* ¶¶ 2-3. However, in order to justify holding the person in contempt, the judge must know that the person is lying, even though the statement is made in the presence of the court. *Id.* ¶ 4. Otherwise, the question of guilt is left to the judge's opinion, informed only by weighing evidence—an inappropriate endeavor when shortcutting due process by imposing direct contempt. *See id.* ¶¶ 4-5; *accord Concha*, 2011-NMSC-031, ¶ 36 ("Since the earliest days of the common law, Anglo-American courts have recognized that where determination of guilt or innocence requires a confession of the party or the testimony of others to supplement the judge's incomplete personal observations, the summary procedures of direct contempt are inappropriate." (internal quotation marks and citation omitted)).

**{20}**   Turning now to the facts of this case, it is evident that the judge had no knowledge of Raphaelson's guilt. The judge did not know that Raphaelson had contact with anyone who was positive for COVID-19. Indeed, the only reason the judge became aware that Raphaelson may have violated a court order or failed to disclose any contact was because of Raphaelson's own admission—an admission that came far too late to be helpful. But, such an admission provides no basis for holding a person in direct contempt, and the fact that her admission was contradicted by testimony from courthouse staff highlights the problem with relying on it. *See id.* All of the arguments presented by the State center around Raphaelson's COVID-19 contact as well. We agree with the State that Raphaelson's appearance in the courthouse happened in the literal presence of the judge, and if Raphaelson had in fact been in contact with COVID-19 less than fourteen days prior she was in clear violation of safety protocols. However, the judge still lacked the knowledge necessary to know her presence was a violation of any order, or that Raphaelson knew, but failed to disclose anything. Moreover, while holding someone in direct contempt may be necessary to regain control of a courtroom or address an immediate disruption, *see id.*, whatever exposure happened in this case could not have been limited by holding Raphaelson in contempt. Any indication to the contrary is undermined by the judge's decision to recess proceedings before initiating them again to take evidence about Raphaelson's interactions with courthouse staff. Similar to the alleged contemnors in *Concha, Stout*, and *Maes*, Raphaelson could not be held in direct contempt because the judge had no knowledge of her guilt, despite the conduct which *could* constitute a violation of a court order occurring in the physical

presence of the court. Accordingly, Raphaelson was, at most, in indirect contempt of court. As a result, the district court abused its discretion by dispensing with the due process safeguards required by Rule 5-112 for cases of indirect contempt.

**CONCLUSION**

**{21}** Nothing in this opinion is to be construed as condoning Raphaelson's conduct, nor is it meant to excuse any violation of any court order or ethical duty Raphaelson may have committed. This opinion is instead about procedure. Because the district court incorrectly used summary proceedings to punish for what was at most indirect contempt, we reverse the district court and vacate Raphaelson's conviction and remand for further proceedings.

**{22}    IT IS SO ORDERED.**

**SHAMMARA H. HENDERSON, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**JACQUELINE R. MEDINA, Judge**