# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  January 4, 2018**

**No. S-1-SC-34789**

**TUE THI TRAN,**

Petitioner-Petitioner,

and

**CLINTON W. DEMMON,**

Intervenor-Petitioner,

v.

**ROBERT G. BENNETT,**

Respondent-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**T. Glenn Ellington, District Judge**

Caren I. Friedman
Santa Fe, NM

for Petitioners

Law Office of Jane B. Yohalem
Jane B. Yohalem

Santa Fe, NM

for Respondent

**OPINION**

**MAES, Justice.**

{1}     This case involves three people who agreed to co-parent one minor child (Child): Tue Thi Tran (Mother); Clinton Demmon (Demmon), who is Child's biological father and Mother's current partner; and Robert Bennett (Bennett), who was married to Mother at the time of Child's birth.  In 2007, the parties entered into a memorandum of agreement that settled the issue of legal paternity in Demmon's favor yet provided that all three adults were Child's "co-parents."  The district court adopted the memorandum of agreement as a stipulated order of the court.  Disputes arose between the parties, and in 2012 the district court issued a parenting order that expressly awarded joint legal custody of Child to Mother, Demmon, and Bennett.  The district court also held Mother and Demmon in contempt of court for violating the vacation and visitation provisions in the memorandum of agreement.

{2}     On appeal, Mother and Demmon challenge the 2012 parenting order, arguing that Bennett is not Child's father and that the district court erred by awarding custody to a non-parent.  Mother and Demmon also contend that the district court abused its discretion by holding them in contempt of court.

{3}     We conclude that the parties effectively settled the issue of paternity under the Uniform Parentage Act, NMSA 1978, Sections 40-11-1 to -23 (1986, as amended

through 2004) (repealed 2009), when they entered into the memorandum of agreement and that the district court adjudicated the issue of paternity when it issued the stipulated order adopting the agreement. We therefore hold that Demmon is Child's legal father. We further hold that the parties' memorandum of agreement does not confer parental rights on Bennett, in addition to Child's two legal parents. Finally, we vacate the contempt order for the reasons set forth in this opinion.

## I.    BACKGROUND

{4}    Mother and Bennett got married in 1998 in Vietnam, Mother's home country, and later moved to Santa Fe. While married to Bennett, Mother began a relationship with Demmon and became pregnant. During the pregnancy, Mother informed Bennett that Demmon might be the baby's father. Despite doubt regarding whether Bennett was the biological father, Bennett's name was entered on Child's birth certificate when Child was born in May 2003. Mother and Child lived with Bennett until Child was nearly twenty-two months old. According to Mother, Demmon visited Mother and Child soon after Child's birth and continued to visit Mother and Child when Bennett was not at home. In early 2005, Mother and Child moved into Demmon's home, and the three have lived together as a family ever since.

{5}    Mother filed for divorce in October 2006. Mother represented in her petition

2

for dissolution of marriage that she and Bennett had no minor children. Bennett responded by filing an emergency motion asserting that he is Child's father and that Mother had denied Bennett contact with Child. Bennett also filed a counterclaim, arguing that even if Demmon is Child's biological father, Bennett was presumed to be Child's legal father under the Uniform Parentage Act because he and Mother were married when Child was born. Bennett asked the district court to grant the divorce and to determine parenthood issues.

{6} In November 2006, Demmon filed a motion in Mother and Bennett's divorce case, seeking to establish paternity. Demmon attached the results of a DNA (deoxyribonucleic acid) test which found a 99.8% probability that Demmon is Child's biological father. Demmon asserted that Bennett was aware of the test results yet refused to undergo genetic testing or to have the birth certificate changed to reflect Demmon's paternity. In December 2006, the district court granted Demmon's unopposed motion to intervene in the case. The district court scheduled a hearing on Demmon's paternity claim and gave Bennett two months to obtain a genetic test for himself, should he wish to do so.

{7} It appears from the record before this Court that the district court never held the paternity hearing because the parties, who were represented by counsel, settled

3

the matter through mediation proceedings, resulting in a memorandum of agreement. The memorandum of agreement included a section labeled "Legal paternity" that required the modification of Child's birth certificate "to indicate Clint Demmon as his biological father." The agreement also included a "Co-parentage" provision, stating that Child

> has three co-parents—[Mother, Demmon, and Bennett]. [Demmon and Mother] affirm that [Bennett] as a co-parent is part of [Child's] life and deserves time and involvement with [Child]. All three will demonstrate through cooperative and supportive actions their shared primary concern for [Child's] well-being. Each will encourage and support [Child's] relationships with the others.

{8} The agreement further provided that Mother and Demmon would include Bennett in decisions related to Child's health and education, with one vote to Bennett and two votes to Mother and Demmon, but that Bennett would not be expected to contribute financially to Child's education or dental expenses. The agreement granted Bennett visitation with Child three days a week, plus additional time during extended school breaks. The agreement required the parties to meet each year to create a summer vacation schedule for Child. Finally, the agreement contemplated annual review and recognized that it "may be superseded by a more detailed Parenting Plan."

{9} The district court issued a stipulated order in October 2007 that adopted the

4

memorandum of agreement as an order of the court. Consistent with the legal paternity provision in the agreement, the stipulated order required Bennett to "sign all necessary documentation to modify the birth certificate to indicate [Demmon] as [Child's] biological father." Mother and Bennett finalized their divorce in November 2008. The divorce decree stated that "[t]he parties share responsibility for [Child], whose care and disposition are addressed and ordered in the [stipulated order] . . . ."

{10} In August 2011, Mother and Demmon filed a motion for an order to show cause alleging that for three years in a row, Bennett had taken Child on a summer vacation without Mother and Demmon's consent. They complained that Bennett had refused during the most recent trip to provide an itinerary or contact information and had not permitted Child to call Demmon. Mother and Demmon argued that Bennett's conduct violated the visitation and vacation provisions in the agreement and asked the district court to terminate Bennett's visitation rights and to hold him in contempt of court. The district court held a hearing in October 2011 and found that all three parties were responsible for generating conflict around Child's summer vacation schedule. The court declined to hold Bennett in contempt of court.

{11} About three months later, Bennett filed a motion for an order to show cause, alleging that Mother and Demmon had violated the agreement by taking Child on a

5

trip over Child's winter break, thereby preventing Bennett's court-ordered visitation time with Child. Following an evidentiary hearing, the district court found that the parties had attempted to communicate about winter break by passing letters in Child's backpack but had failed to reach an agreement. The court further found that Mother and Demmon knew when they took Child on vacation that their trip interfered with Bennett's visitation time. The court concluded that Mother and Demmon's conduct constituted a knowing and willful violation of the 2007 stipulated order and held them in contempt of court. The court ordered that Mother and Demmon "shall be incarcerated for a period of fifteen (15) days, with said period of incarceration suspended until further order of the Court." The district court also ordered Mother and Demmon to pay Bennett's reasonable attorney's fees associated with the contempt proceedings. The district court subsequently awarded Bennett a total of $3,015.73 in attorney's fees, costs, and gross receipts tax over Mother and Demmon's objection to the sum.

{12} The district court issued an amended parenting order in December 2012. The order did not use the term "co-parents" but did award "joint legal custody" of Child to Mother, Demmon, and Bennett as "joint legal custodians." The order required the parties to "share major decisions of education, medical care, religion, discipline and

6

other matters of major significance." The order granted Bennett weekly and holiday visitation with Child and permitted Bennett to take Child on a week-long vacation.

{13} Mother and Demmon appealed the 2012 parenting order and the order holding them in contempt of court. The Court of Appeals affirmed in an unpublished memorandum opinion. *Tran v. Bennett*, No. 32,677, mem. op. ¶ 2 (N.M. Ct. App. May 28, 2014) (non-precedential), *cert. granted*, 2014-NMCERT-008. Mother and Demmon filed a petition for writ of certiorari, asking this Court to address whether the district court erred by (1) awarding joint legal custody to two biological parents and to a third person who lacks parental standing, and (2) holding Mother and Demmon in contempt of court. We granted certiorari under Article VI, Section 2 of the New Mexico Constitution and NMSA 1978, Section 34-5-14(B) (1972), and we now reverse.

**II.     DISCUSSION**

**A.      Mother and Demmon Are Child's Parents, and the Memorandum of Agreement Does Not Confer Parental Rights on Bennett**

**1.      A New Parenting Order Entered in 2016 Did Not Render This Issue Moot**

{14} After this Court granted certiorari and heard oral argument on this case, the parties' appellate counsel filed a joint notice in this Court, explaining that the district court had entered a new parenting order in August 2016 and that the time to appeal

7

from the order had run without an appeal being filed. Prior to issuing the order, the district court held a hearing at which Mother and Demmon appeared, represented by counsel, but at which Bennett failed to appear. The 2016 parenting order awarded "sole legal custody" to Mother and Demmon, superseding the 2012 parenting order, which had awarded "joint legal custody" to Mother, Demmon, and Bennett. The 2016 parenting order further provided that

> [Mother] and [Demmon] shall make all decisions concerning [Child's] education, childcare, health care (physical or mental), ongoing activities and religious upbringing. [Mother] and [Demmon] shall keep . . . Bennett apprised of any major changes in [Child's] education, childcare, health care (physical or mental), ongoing activities and religious upbringing. [Mother] and [Demmon] shall not change [Child's] residence, which is Santa Fe, New Mexico, without a court order.

The order granted Bennett weekly and holiday visitation with Child and permitted Bennett to take Child on a week-long vacation.

{15} In their joint notice to this Court, appellate counsel explained that the

> parties dispute the meaning and effect of the [2016] order. [Bennett] interprets the order to mean that he is Child's co-parent. [Mother and Demmon] interpret the order to mean that [Bennett] is not Child's co-parent. The parties are in agreement that the case pending before this Court is not moot.

We agree. Since no party has appealed the 2016 parenting order, which awards "sole legal custody" to Mother and Demmon, it appears that the narrow issue of whether

8

the district court erred in 2012 by awarding "joint legal custody" to Mother, Demmon, and Bennett is moot. But because this appeal centers around whether the parties could mutually agree that Child "has three co-parents," Mother, Demmon, and Bennett, we agree with the parties that the parentage issues raised by this appeal are not moot. Although the issue of custody has been resolved by the 2016 parenting order, the broader issue remains: What is Bennett's legal relationship to Child?

**2.      Standard of Review**

{16}      Mother and Demmon's claim that Bennett is not Child's parent requires us to interpret statutory provisions relating to parentage. We apply de novo review to questions of statutory construction. *Chatterjee v. King*, 2012-NMSC-019, ¶ 11, 280 P.3d 283. To the extent that this claim implicates issues of constitutional law or constitutional rights, our review is likewise de novo. *See N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 27, 142 N.M. 248, 164 P.3d 947.

**3.      Demmon Is Child's Father Under the Uniform Parentage Act**

{17}      Bennett and Demmon each claim to be Child's father under the Uniform Parentage Act. As a preliminary matter, we must determine which version of the Act applies. New Mexico first enacted the Uniform Parentage Act in 1986. *See* Uniform Parentage Act (UPA), NMSA 1978, §§ 40-11-1 to -23 (1986, as amended through

2004) (repealed 2009). The Legislature repealed the original UPA in 2009 and adopted the New Mexico Uniform Parentage Act, effective January 1, 2010. *See* NMSA 1978, §§ 40-11A-101 to -903 (2009). The parties rely on both acts. We conclude that the original UPA applies in this case because Demmon sought to establish paternity and was joined as an intervenor in Mother and Bennett's divorce case in 2006, prior to the new statute taking effect in 2010. *See* § 40-11A-903 ("A proceeding to adjudicate parentage that was commenced before the effective date of the New Mexico Uniform Parentage Act is governed by the law in effect at the time the proceeding was commenced.").

{18}    We thus turn to the original UPA, NMSA 1978, §§ 40-11-1 to -23 (1986, as amended through 2004) (repealed 2009), as the appropriate mechanism for determining who is Child's father. The UPA provides multiple scenarios under which a "man is presumed to be the natural father of a child." Section 40-11-5(A). Relevant here, a man is presumed to be the natural father if "he and the child's natural mother are or have been married to each other and the child is born during the marriage." Section 40-11-5(A)(1). Alternatively, a "man is presumed to be the natural father of a child if, pursuant to blood or genetic tests . . . the probability of his being the father is ninety-nine percent or higher." Section 40-11-5(D). In this case, Bennett and

10

Demmon each established a presumption that he was Child's natural father under the UPA. Bennett was presumed to be Child's natural father because Child was born during Mother and Bennett's marriage. Demmon was presumed to be Child's natural father because uncontested DNA test results demonstrated a 99.8% probability that he is Child's biological father.

{19} The UPA requires the district court to adjudicate paternity when there is a dispute between two presumptive natural fathers and sets forth a procedure for doing so. *See* § 40-11-5(C) ("If two or more men are presumed under this section to be the father of the same child, paternity shall be established as provided in the Uniform Parentage Act . . . ."). The court begins by holding an informal hearing "[a]s soon as practicable" after the commencement of the paternity action. Section 40-11-10. Following the informal hearing, the court provides the parties with an initial recommendation regarding settlement of the paternity issue. Section 40-11-11(A). If the parties accept the initial recommendation, the court enters judgment consistent with the recommendation. Section 40-11-11(B). "If a party refuses to accept [the initial] recommendation . . . and blood tests have not been taken, the court shall require the parties to submit to blood tests, if practicable." Section 40-11-11(C). The court shall then "make an appropriate final recommendation." *Id.* "If a party refuses

11

to accept the final recommendation, the action shall be set for trial . . . ." *Id.* If the action goes to trial, the court adjudicates paternity based on all relevant evidence, including genetic test results. *See* § 40-11-13(C), (D). If the adjudicated father is not listed on the child's birth certificate, "the court shall order that a new birth certificate be issued." Section 40-11-15(B); *see also* § 40-11-22(A) ("Upon order of a court . . . the vital statistics bureau . . . shall prepare a new certificate of birth consistent with the findings of the court and shall substitute the new certificate for the original certificate of birth.").

{20} Bennett asserts that he is Child's father under the UPA, arguing that Demmon waited too long to assert paternity and failed to obtain a court order establishing paternity. Mother and Demmon acknowledge that the district court did not expressly adjudicate paternity under the UPA but argue that this Court should nonetheless recognize that Demmon is Child's father under the UPA.

{21} We conclude that Demmon is Child's father under the UPA. Demmon sought genetic testing when Child was an infant and confirmed with near certainty that he is Child's biological father. Demmon then sought an adjudication of paternity and was granted intervenor status in this case. *See* § 40-11-8(A) (providing that an action to determine parentage under the UPA may be joined with an action for dissolution

12

of marriage). Although the district court gave Bennett two months to arrange for genetic testing prior to a paternity hearing, Bennett failed to undergo testing, object to the test results submitted by Demmon, or otherwise rebut the presumption that Demmon is Child's natural father. Instead, Bennett and Demmon agreed to settle the issue of legal paternity and entered into the memorandum of agreement. The agreement provided that Demmon would be recognized as Child's legal father and would be listed on Child's birth certificate and that Bennett would maintain visitation rights with Child and would not be required to provide financial support.

{22} Despite these agreements, Bennett argues that this is not an appropriate case in which to use biological evidence to rebut the presumption that he is Child's natural father because he has always acted as Child's father, even after learning that Demmon is Child's biological father. *See* § 40-11-5(C) (providing that a presumption of paternity "may be rebutted *in an appropriate action* only by clear and convincing evidence" (emphasis added)). Mother and Demmon argue that it is appropriate to use DNA evidence to rebut the presumption that Bennett is Child's father because doing so leaves Child with two fit, natural parents, Mother and Demmon. We agree that this is an appropriate action in which to use biological evidence to rebut the presumption of paternity. The UPA requires the district court to determine paternity "[i]f two or

13

more men are presumed to be the father of the same child," *see id.*, and permits the district court to rely on genetic test results to adjudicate paternity, *see* §§ 40-11-11(C), 40-11-12, 40-11-13(C). This Court has cautioned that it would be inappropriate to rebut a presumption of parentage if doing so would deprive a child of having the support of two parents. *See Chatterjee*, 2012-NMSC-019, ¶ 42 (providing examples from California cases and concluding "that the legislature, by using the phrase '*in an appropriate action*,' limited the circumstances for rebuttal of the parentage presumption" (emphasis in original)). Similarly, the Court of Appeals has explained that the district court will "not determine paternity solely on the basis of a biological relationship" if doing so would sever a close emotional bond between a child and a presumed father. *Tedford v. Gregory*, 1998-NMCA-067, ¶ 15, 125 N.M. 206, 959 P.2d 540. But these concerns are not determinative in this case because rebutting the presumption leaves Child with two fit, natural parents. Moreover, the parties assure this Court that regardless of the outcome of this appeal, all parties want Bennett to maintain his relationship with Child.

{23} Contrary to Bennett's claim that there is no court order determining paternity, we conclude that the 2007 stipulated order constituted an adjudication of the issue of paternity. The order adopted the memorandum of agreement, which recognized

14

Demmon as Child's father and directed Bennett to take the steps needed to modify Child's birth certificate. Because the parties settled the paternity issue through a mediated agreement, the district court did not need to follow the procedures in the UPA for holding a paternity hearing or proposing a recommended settlement to the parties. We do not find anything in the UPA or our case law prohibiting parties from stipulating to or settling the issue of paternity. To the contrary, the UPA encourages settlement of paternity disputes prior to trial. *See* § 40-11-11(A)-(C) (requiring the district court to make recommendations for pre-trial settlement). Under the circumstances of this case, further litigation of the paternity issue was not needed. We hold that Demmon is Child's father under the UPA, as determined in the 2007 stipulated order adopting the memorandum of agreement.

**4.      The Memorandum of Agreement Does Not Confer Parental Rights on Bennett**

{24}     The 2007 memorandum of agreement settled the issue of legal paternity in Demmon's favor but also designated Mother, Demmon, and Bennett as "co-parents," purporting to give Child three parents. Bennett argues that the memorandum of agreement created an enforceable three-way legal custody arrangement. Mother and Demmon assert that the agreement did not give Bennett custody and argue that the agreement could not confer parental standing or custodial rights on Bennett because

15

Bennett is not Child's parent. We need not determine whether the memorandum of agreement awarded custody to Bennett because the agreement has been superseded by the 2012 and 2016 parenting orders. *See Rhinehart v. Nowlin*, 1990-NMCA-136, ¶ 14, 111 N.M. 319, 805 P.2d 88 (determining that the district court has authority to modify or vacate a stipulated order involving the care and custody of a child). But we conclude that the memorandum of agreement, which settled the issue of legal paternity in Demmon's favor, does not confer enforceable parental rights on Bennett.

{25} Mother and Demmon are Child's legal parents under the UPA. *See Chatterjee*, 2012-NMSC-019, ¶ 5 n.3 (noting that the UPA uses the terms paternity and maternity to "refer to legal determinations of parenthood"); *see also* § 40-11-15(A) (providing that a district court order adjudicating paternity under the UPA is "determinative for all purposes"). New Mexico law confers a variety of rights and privileges on a child's parents and subjects them to the duties and obligations of parentage. *See* § 40-11-2. Moreover, "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000).

{26} In a custody dispute between a parent and a non-parent, "New Mexico has long recognized the parental preference doctrine." *In re Guardianship of Ashleigh R.*,

16

2002-NMCA-103, ¶ 14, 132 N.M. 772, 55 P.3d 984. The parental preference doctrine limits the district court's discretion to award custody to a non-parent and requires the court to award custody to the parent unless the parent is unfit or extraordinary circumstances are present. *Id.* ¶¶ 14-16; *see* NMSA 1978, § 40-4-9.1(K) (1999) ("When any person other than a natural or adoptive parent seeks custody of a child, no such person shall be awarded custody absent a showing of unfitness of the natural or adoptive parent."); *see also In re Adoption of J.J.B.*, 1995-NMSC-026, ¶ 59, 119 N.M. 638, 894 P.2d 994 ("A parent's right is not absolute and under extraordinary circumstances, custody of a child may be awarded to a nonparent over the objections of a parent."). If the district court finds "parental unfitness or extraordinary circumstances, the district court can then determine what custody arrangement would be in the comparative best interest of the child." *In re Ashleigh R.*, 2002-NMCA-103, ¶ 16.

{27} In this case, Mother and Demmon are Child's parents, so the district court could not award legal custody to Bennett over Mother and Demmon's objection absent a finding that Mother and Demmon were unfit or that extraordinary circumstances were present. The district court never made such a finding.

{28} Bennett asserts that his visitation rights should remain intact if this Court

17

concludes that Demmon is Child's father. Mother and Demmon agree that Bennett should continue to have visitation with Child, and the 2016 parenting order grants Bennett visitation rights. The 2016 parenting order is not before us on appeal, and we make no determination regarding Bennett's visitation rights. We observe, however, that New Mexico law does not limit the right to seek visitation in the same way that it limits the right to seek custody. *See Rhinehart*, 1990-NMCA-136, ¶ 19 ("[T]he legislature did not equate custody and visitation rights."). In *Rhinehart*, the Court of Appeals examined the statutes addressing dissolution of marriage proceedings and concluded that the district court's authority over matters relating to the guardianship, care, and custody of children includes the power to grant visitation rights to a person who is significant and important to a child's welfare. *See id.* ¶ 14; *see also* NMSA 1978, § 40-4-7(B)(4) (1997) (providing that in a dissolution of marriage proceeding, the district court may issue "an order for the guardianship, care, custody, maintenance and education of the minor children"). Visitation is not subject to the parental preference doctrine, and the district court has discretion to award visitation to a non-parent when visitation is in the best interests of the child. *See Rhinehart*, 1990-NMCA-136, ¶¶ 25-26. *But cf. Troxel*, 530 U.S. at 73, 75 (holding that application of a grandparent visitation statute violated a parent's due process

18

right but declining to define "the precise scope of the parental due process right in the visitation context"); *In re Adoption of Francisco A.*, 1993-NMCA-144, ¶ 20, 116 N.M. 708, 866 P.2d 1175 ("[B]ecause granting visitation rights does infringe on a parent's custody, it is appropriate to limit this decision to situations such as this where the party seeking visitation has acted in a custodial or parental capacity.").

{29} We hold that the memorandum of agreement does not confer parental rights on Bennett. Although the agreement designated Bennett as a "co-parent," the significance of that designation is unclear because the word "co-parent" is not defined in the dissolution of marriage statutes or the UPA. *Cf.* § 40-4-9.1(L)(5) (defining "parent" for purposes of determining custody in a dissolution of marriage proceeding); § 40-11-2 (defining "parent and child relationship" as used in the original UPA). Moreover, the memorandum of agreement has been superseded by the 2012 and 2016 parenting orders. Under the 2016 parenting order, Bennett is a third party with visitation rights, not a parent.

**B. The District Court Erred by Holding Mother and Demmon in Contempt of Court**

**1. Standard of Review**

{30} We review the district court's imposition of contempt sanctions for abuse of discretion. *See Gedeon v. Gedeon*, 1981-NMSC-065, ¶ 13, 96 N.M. 315, 630 P.2d

267.  An abuse of discretion occurs when the court's "ruling is clearly against the logic and effect of the facts and circumstances of the case" or is "based on a misunderstanding of the law." *Chavez v. Lovelace Sandia Health Sys., Inc.*, 2008-NMCA-104, ¶ 25, 144 N.M. 578, 189 P.3d 711 (internal quotation marks and citation omitted).

**2.      The District Court Failed to Follow the Substantive and Procedural Law Governing Contempt of Court Proceedings**

{31}    In its contempt order, the district court found that Mother and Demmon knowingly and willfully violated the 2007 stipulated order by unilaterally taking Child on a vacation that interfered with Bennett's visitation rights.  The district court ordered that Mother and Demmon "shall be incarcerated for a period of fifteen (15) days, with said period of incarceration suspended until further order of the Court." The district court also ordered Mother and Demmon to pay Bennett's "reasonable attorney's fees for the preparation of the motion and order to show cause, oral argument and the order resulting from the hearing."

{32}    On appeal, Mother and Demmon challenge the order of contempt as an abuse of power.  They argue that the district court acted arbitrarily by holding them in contempt because the court had refused to hold Bennett in contempt for similar conduct occurring the previous summer.  Bennett contends that the district court acted

20

within its discretion when it held Mother and Demmon in contempt. He argues that the contempt order was justified because Mother and Demmon's contemptuous conduct occurred less than three months after the district court admonished the parties to abide by the vacation and visitation provisions in the memorandum of agreement. We conclude that the district court abused its discretion by holding Mother and Demmon in contempt because the contempt proceedings and resulting order reflect a misunderstanding of contempt law.

{33} The district courts possess inherent and statutory authority to impose punitive or remedial sanctions for contempt of court. *See* NMSA 1978, § 34-1-2 (1851); *see also Concha v. Sanchez*, 2011-NMSC-031, ¶¶ 22-26, 150 N.M. 268, 258 P.3d 1060. "Contempts of court are classified as civil or criminal," and the "major factor in determining whether a contempt is civil or criminal is the purpose for which the power is exercised." *Concha*, 2011-NMSC-031, ¶ 24 (internal quotation marks and citation omitted). Criminal contempt proceedings vindicate the authority of the court by punishing "completed acts of disobedience." *Id.* ¶ 26. Civil contempt proceedings are remedial, "instituted to preserve and enforce the rights of private parties to suits and to compel obedience to the orders, writs, mandates and decrees of the court." *In re Klecan*, 1979-NMSC-094, ¶ 5, 93 N.M. 637, 603 P.2d 1094.

{34} In this case, our review of the contempt order is complicated by the district court's failure to specify whether it was holding Mother and Demmon in civil contempt, criminal contempt, or both. For purposes of our analysis, we treat the contempt order primarily as one of civil contempt because the apparent purpose of the contempt proceedings was to preserve and enforce Bennett's visitation rights and to compel Mother and Demmon to comply with the 2007 order adopting the memorandum of agreement. Additionally, although we are not bound by the parties' characterization of the contempt as civil or criminal, *see Concha*, 2011-NMSC-031, ¶ 32, we note that the parties rely on civil contempt law in their briefs and that the Court of Appeals treated the contempt as civil. *See Tran*, No. 32,677, mem. op. ¶ 41.

{35} "The elements necessary for a finding of civil contempt are: (1) knowledge of the court's order, and (2) an ability to comply." *In re Hooker*, 1980-NMSC-109, ¶ 4, 94 N.M. 798, 617 P.2d 1313; *see also State v. Rivera*, 1998-NMSC-024, ¶ 13, 125 N.M. 532, 964 P.2d 93 (recognizing a conflict in prior case law regarding the elements of civil contempt and explaining that "[n]either willfulness nor intent is an element of civil contempt"). If the court finds civil contempt, there are two general categories of remedial sanctions that the court may impose: compensatory sanctions or coercive sanctions. *See State ex rel. Apodaca v. Our Chapel of Memories of N.M.,*

22

*Inc.*, 1964-NMSC-068, ¶ 10, 74 N.M. 201, 392 P.2d 347.

{36} Compensatory sanctions may include damages or attorney's fees and are imposed for the purpose of compensating a party for pecuniary losses sustained due to the contempt. *Id.* ("[S]anctions may . . . be employed in civil contempt . . . to compensate the complainant for losses sustained."); *see also In re Hooker*, 1980-NMSC-109, ¶ 5 ("The general rule is that a court has power to award damages and attorney's fees to a party aggrieved by a contempt."). Our courts have limited the amount of a compensatory sanction "to the actual loss plus the costs and expenses, including counsel fees, incurred in investigating and prosecuting the contempt." *In re Hooker*, 1980-NMSC-109, ¶ 5.

{37} Coercive sanctions may include "fines, imprisonment, or other sanctions" designed "to compel the contemnor to comply in the future with an order of the court." *Concha*, 2011-NMSC-031, ¶ 25. Coercive sanctions are conditional, imposed to address the contemnor's continuing violation of a court order. *See id.* To effect this purpose, an order imposing a coercive sanction should state the actions that the contemnor must take to purge the contempt. *See In re Hooker*, 1980-NMSC-109, ¶ 4. A contemnor subject to a coercive sanction has the power to discharge the civil contempt at any time "by doing what [the contemnor] has previously refused to do."

*Concha*, 2011-NMSC-031, ¶ 25 (internal quotation marks and citation omitted). Thus, the coercive sanctions "end when the contemnor complies" with the underlying court order. *Id.*

{38}    In this case, the fifteen-day term of imprisonment imposed by the district court was not an appropriate remedial sanction for civil contempt of court. Sending Mother and Demmon to jail could not compensate Bennett for any monetary damages sustained due to the contemptuous conduct. *See Jencks v. Goforth*, 1953-NMSC-090, ¶ 20, 57 N.M. 627, 261 P.2d 655 ("Imprisonment cannot undo or remedy what has been done, nor afford any compensation for the pecuniary injury caused by the disobedience." (internal quotation marks and citation omitted)). And although a conditional sentence of imprisonment may be an appropriate civil contempt sanction in some situations, the sentence must be crafted in a way that permits the contemnor to discharge himself or herself of the contempt by complying with the court's order. *See State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 60, 125 N.M. 343, 961 P.2d 768 ("A court may directly order an individual to comply with its order to purge himself or herself of contempt and may stay further sanctions if the individual complies with the order by a specified date."); *see, e.g.*, *Papatheofanis v. Allen*, 2009-NMCA-084, ¶ 5, 146 N.M. 840, 215 P.3d 778 ("The district court held [w]ife in

24

contempt for failure to pay her share of the fee, ordered [w]ife to pay a $250 fine, but allowed [w]ife to purge the contempt if she made full payment to the expert by February 28, 2007."). Here, it was unclear whether the contempt order had a coercive purpose because the order did not state the actions that Mother and Demmon must take to purge the contempt.

{39} Moreover, it is not clear how imposition of a jail sentence would be an effective means of coercing a child's parents into complying with an underlying order addressing the care and custody of the child. When exercising discretion to impose coercive sanctions, the judge must consider "the degree of harm threatened by continued contumacy and whether or not the contemplated sanctions will bring about a compliance with the court's order." *State v. Pothier*, 1986-NMSC-039, ¶ 4, 104 N.M. 363, 721 P.2d 1294. In this case, imprisoning Mother and Demmon would have prevented them from caring for Child under the 2007 stipulated order.

{40} In addition, we take this opportunity to express concern that Mother may not have been afforded sufficient procedural due process at the hearing. "Civil contempt sanctions may be imposed by honoring the most basic due process protections—in most cases, fair notice and an opportunity to be heard." *Concha*, 2011-NMSC-031, ¶ 25. Mother and Demmon received notice of the contempt allegations, and the

25

district court held a show cause hearing before finding Mother and Demmon in contempt of court. But Mother did not have a Vietnamese interpreter at the hearing, and the record reflects that the lack of an interpreter may have precluded Mother from having a meaningful opportunity to be heard. *See Bethlehem Area Sch. Dist. v. Zhou*, 976 A.2d 1284, 1286 (Pa. Commw. Ct. 2009) (explaining that the "constitutionally protected rights afforded by due process . . . includes the right to be heard which, in certain circumstances, include the right to assistance from an interpreter"). During Mother's testimony, the district court judge remarked that Mother did not seem to understand the questions posed by Bennett's counsel. And at the end of the hearing, the judge acknowledged that at

> [a]ny subsequent hearings we need an interpreter for [Mother]. I think she probably does have relevant competent material testimony to give, but I think the language problem has become—or maybe always has been—so severe that I'm not sure she's able to meaningfully participate as a party or to testify as a witness in future hearings. So we'll need to make arrangements for an interpreter for her from now on.

{41} We are troubled that the district court imposed contempt sanctions on Mother after concluding that she was unable to meaningfully participate in the contempt hearing. We do not base our holding on this procedural due process issue, which was not raised by the parties. But we remind courts that the exercise of the contempt power must comport with the appropriate level of procedural due process, which

26

varies depending on whether the proceeding is civil or criminal in nature. *See Concha*, 2011-NMSC-031, ¶¶ 25-26.

{42}    Having concluded that the contempt order cannot be upheld as a valid exercise of the civil contempt power, we consider whether the order can be enforced as one of criminal contempt. Although the district court judge failed to articulate whether he was exercising the civil contempt power or the criminal contempt power, the language of the contempt order suggests that the sanction may have had a punitive, rather than remedial, purpose. If the purpose of the sanction was to punish Mother and Demmon for a previous violation of the 2007 stipulated order, the sanction is better characterized as one of criminal contempt, and Mother and Demmon were entitled to the full panoply of due process protections afforded to criminal defendants. *See id.* ¶¶ 26, 34. Of particular significance, a criminal contempt defendant "is presumed innocent until found guilty beyond a reasonable doubt" and "cannot be compelled to testify against himself [or herself]." *Int'l Minerals & Chem. Corp. v. Local 177, United Stone & Allied Prods. Workers*, 1964-NMSC-098, ¶ 16, 74 N.M. 195, 392 P.2d 343. In this case, Bennett's counsel compelled Mother and Demmon to take the stand at the contempt hearing without any advice of rights. There is no indication that the district court followed the procedures of the criminal law or

applied the heightened standard of proof associated with a criminal trial and the presumption of innocence. We conclude that the contempt sanctions cannot be upheld as a valid exercise of the criminal contempt power.

{43} We have cautioned judges to use "extraordinary self-restraint to avoid abuses" of the contempt power. *Concha*, 2011-NMSC-031, ¶ 30. In this case, the contempt order reflects a misunderstanding of the substantive and procedural law governing contempt of court proceedings. We hold that the contempt order was neither a valid civil contempt order nor a valid criminal contempt order, and we vacate the contempt order as an abuse of discretion.

## III. CONCLUSION

{44} We hold that Demmon is Child's legal father under the UPA and that the memorandum of agreement does not confer parental rights on Bennett. We further hold that the district court abused its discretion when it held Mother and Demmon in contempt of court, and we vacate the contempt order.

{45} **IT IS SO ORDERED.**


_____

**PETRA JIMENEZ MAES, Justice**

28

**WE CONCUR:**

_____

**JUDITH K. NAKAMURA, Chief Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL,  Justice**

29