# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: _____**

**Filing Date:  December 20, 2018**

**NO. S-1-SC-35427**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH AND FAMILIES**
**DEPARTMENT,**

Petitioner-Petitioner,

v.

**JANET MERCER-SMITH and**
**JAMES MERCER-SMITH,**

Respondents-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Barbara J. Vigil, District Judge**

Walz and Associates
Jerry A. Walz
Albuquerque, NM

for Petitioner

Comeau, Maldegen, Templeman & Indall, LLP
Larry D. Maldegen
William Phelps Templeman
Stephen J. Lauer

Santa Fe, NM

Dan Cron Law Firm, P.C.
Daniel Robert Cron
Santa Fe, NM

for Respondents

# OPINION

**MAES, Justice.**

{1} While the parties in this case litigated contempt proceedings over the course of seven years, the children at the center of the case aged out of the system and became peripheral to a nearly $4,000,000 judgment in favor of Respondents Janet and James Mercer-Smith (the Mercer-Smiths), who had pleaded no contest to allegations of abuse against their two minor daughters Julia and Rachel. This case was initiated in 2001 as an abuse and neglect proceeding and turned into a dispute over whether the Children, Youth and Families Department (CYFD) had violated the district court's decision that Julia and Rachel could not be placed with former employees of a group home where they had been residing. After protracted litigation, the district court held CYFD in contempt for violating its placement decision and, almost four years later, imposed the sanction for the violation, ordering CYFD to pay the Mercer-Smiths more than $1,600,000 in compensatory damages and more than $2,000,000 in attorney fees and costs. The award was based on the district court's determination that the violation of the placement decision resulted in the loss of the Mercer-Smiths' chance of reconciliation with Julia and Rachel. We hold that the purpose for which the district court exercised its contempt power was not remedial in nature and therefore cannot be upheld as a valid exercise of civil contempt power. Accordingly,

we reverse the contempt order and vacate the award in its entirety.

## I.   BACKGROUND

{2}   This case began in early 2001 and was not fully resolved until January 2012, when the final judgment was entered.  The record indicates that nearly every aspect of the proceeding was heavily litigated and highly contentious.  What follows is the background information most relevant to the issues before this Court.  Additional factual development will be done, as needed, in the context of our discussion of those issues.

{3}   In February 2001, James (Father) and Janet (Mother) Mercer-Smith's three daughters—Julia, 13; Rachel, 12; and Alison, 8—were taken into CYFD custody based on allegations of sexual abuse of Julia and Rachel at the hands of Father.  The abuse and neglect petition also alleged that Mother knew or should have known of the abuse but failed to protect her daughters.

{4}   Six months later on August 30, 2001, Father pleaded no contest to allegations that he "touched his children Julia and Rachel in a way that made them feel uncomfortable and which they reasonably perceived as sexual."  Mother pleaded no contest to allegations that she "knew or should have known that her husband . . . touched their children Julia and Rachel in a way that made them feel uncomfortable

and which they reasonably perceived as sexual and she did not take reasonable steps to protect the children from further harm." Based on the pleas, the district court entered a judgment and disposition adjudicating the children to be abused pursuant to NMSA 1978, Section 32A-4-2(B)(2) (1999). The Mercer-Smiths were ordered to comply with a treatment plan approved by the district court. Among other things, the plan contemplated family therapy and visitation, if appropriate, at the daughters' discretion. Although both Julia and Rachel expressed that they had no desire to return to their parents' home, the goal of the treatment plan at that time was reunification. Alison, the youngest daughter, was returned to her parents' custody in November 2001 and was later dismissed from the case.

{5}     The initial judicial review hearing was held on November 7, 2001. The district court found that it was in Julia's and Rachel's best interests to remain in the legal custody of CYFD. The court ordered CYFD to obtain a report from Julia's psychiatrist and Rachel's therapist in anticipation of the next hearing, addressing "why Julia and Rachel are refusing to go home and not wanting visits and what is in their best interests in those regards." The order memorializing the November 7, 2001 hearing was filed on March 21, 2002. At the next hearing on December 10, 2001, the district court ordered that Julia and Rachel begin individual sessions with Dr. Charles

3

Glass, a psychologist retained by CYFD, who would submit a detailed report for the next hearing regarding their progress in therapy. The order memorializing the December 10, 2001 hearing was filed on March 22, 2002.

{6} The district court also ordered Julia and Rachel to participate in mediation with the Mercer-Smiths, which occurred on April 5, 2002. The mediator's memorandum of understanding submitted to the court shortly thereafter reflects that the mediation process had yet to be completed. Therefore, on April 9, 2002, the parties stipulated that the "permanency plan should remain reunification until the mediation process is completed by the parties." However, in May 2002, CYFD filed a report with the district court indicating that reunification was "no longer a viable plan." The report also recommended that individual sessions between the daughters and Dr. Glass cease due, in part, to a breach of confidentiality by Dr. Glass. On July 11, 2002, CYFD filed another report with the court, reiterating its position that reunification was "no longer a viable plan." The report also indicated that the mediation process had been completed, "with no change in the prognosis for reunification" and recommended a change in the permanency plan to planned permanent living arrangements (PPLA) for Julia and Rachel. According to the social worker, the recommended change to PPLA was a result of the Mercer-Smiths' failure to "address the issues that have been at

hand since the inception of this case." Specifically, Father refused to acknowledge the factual basis of his no contest plea and instead focused on convincing case workers that "he [was] not responsible for any problems that his family has experienced and that the girls' allegations of sexual abuse [were] the result of confusion and false memories that have been created by one or more of their therapists." Additionally, Mother purportedly took the position that Father was not guilty of the abuse alleged by Julia and Rachel. The social worker reported that Julia and Rachel "continue to be adamant about not wanting to reunify with their parents." At that time, CYFD reported that Julia and Rachel were living at the Casa Mesita Group Home in Los Alamos.

{7} At a highly contentious hearing on August 15, 2002, the attorney for the Mercer-Smiths insisted that reunification had not been successfully attempted. The district court noted that all attempts to get Julia and Rachel to participate in therapy had failed and that there had been no progress at all toward reunification. Counsel for CYFD stated that Julia and Rachel did not want any involvement with their parents because they felt that they were being accused of wrongdoing and because their parents had not taken responsibility for the abuse inflicted upon them. The district court acknowledged that the daughters' best interests and "perspective" were

5

"paramount." Counsel for the Mercer-Smiths asked the court to order that Julia and Rachel participate in ten family therapy sessions for the purpose of resolving issues between them and the Mercer-Smiths. The guardian ad litem (GAL) insisted that Julia and Rachel were "adamantly opposed to continued therapy" and reiterated CYFD's position—Julia and Rachel felt as though they were on trial and the proceedings had become about what they had done, rather than the abuse their parents had inflicted. Counsel for CYFD stated that it was CYFD's position that it was not in Julia's and Rachel's best interests to go forward with family therapy since the purpose of it was unclear, given that they were adamant about not wanting to reunify with the Mercer-Smiths. Counsel for CYFD also reminded the court that the summary treatment plan adopted on August 30, 2001, specified that Julia and Rachel would not be required to visit with the Mercer-Smiths unless they wished to do so and that reunification would occur only "if appropriate." Julia and Rachel were permitted to address the court and read statements that they had prepared. Excerpts from those statements follow.

> Julia:        . . . I have not had the opportunity as yet to speak with you face to face about the issues in our case. I do not think the mediation helped in the least . . . . I for one came out of the sessions angrier with [the Mercer-Smiths] than before. . . . As far as I'm concerned our family will never be able to be repaired. Mainly for two reasons. One because

6

Jan and James are unwilling to let the past go and concentrate on the future and two, because I'm not ready to listen to them tell me how my memories are planted and that everything is my fault. My hate toward them has become far worse over the last couple of months. . . . If I had my way, I would want their parental rights terminated, but I'm not sure that will happen. . . . I hope this letter will bring some insight to our case from one of the people the court seems to have forgotten.

Rachel: . . . I have recently participated in mediation sessions with my parents and during these sessions I felt as though I was not, what I was saying was not really being heard. It seemed to me as though Janet and James are still not taking responsibility. They said that my memories are not accurate. This caused me to leave the sessions feeling more angry and more hurt than I was before. I know that family therapy has been suggested, but I don't think that this would be beneficial unless they are able to accept things and take responsibility. I don't think that there is a purpose in therapy. . . . And I know returning to my [parents'] home is not what I want, it simply wouldn't work and it would be impossible unless they were able to take responsibility and I think that under the plan of [PPLA], I would be able to begin to have a life that is as close to normal as it could be under the circumstances.

{8} Attempting to find a middle road through the morass, the district court ordered that the permanency plan be changed to PPLA but also ordered family therapy "to attempt to resolve and bring some closure to some of these issues between the girls . . . and their parents." To that end, Julia and Rachel were ordered to participate in ten therapy sessions each with Mother only. The change in the permanency plan to PPLA meant that reunification was no longer a viable option and therefore not a goal of any treatment plan. *See* 8.10.9.7(L) NMAC ("'Planned permanent living

7

arrangement (PPLA)' is a permanency plan established by the court for a youth in [CYFD] custody who is age 16 or older once reunification, adoption, permanency guardianship and placement with a fit and willing relative have been ruled out."). On April 30, 2004—almost two years after the August 15, 2002 hearing—the court reduced to writing its findings, reflecting a change in the permanency plan from reunification to PPLA.

{9}     In the judicial review and/or permanency hearing report filed with the district court in July 2003, CYFD reported that having completed the more structured therapy living situation at Casa Mesita Group Home, Julia and Rachel were ready to transition into regular non-relative foster homes in the Los Alamos area. CYFD sent the Mercer-Smiths a letter dated June 5, 2003, informing them that Rachel would be placed with Gay and Dwain Farley and Julia would be placed with Jennifer and Eric Schmierer after both couples had become licensed as foster parents. On June 30, 2003, the Mercer-Smiths filed an objection to these placements, arguing that they would be inappropriate because Gay Farley and Jennifer Schmierer had been therapists at Casa Mesita Group Home where Julia and Rachel had been residing.

{10}    The district court held four hearings over the course of three months in 2003 to determine the propriety of the proposed placements. At one of those hearings on

8

August 19, 2003, the district court affirmatively stated that CYFD had no duty to support reconciliation between Julia and Rachel and the Mercer-Smiths. Although the district court acknowledged that reconciliation may be, in a broader sense, in the best interests of Julia and Rachel, the court nonetheless concluded the following:

> I understand that reconciliation of the parents is not part of the permanency plan. I can accept that as [an] uncontroverted fact. It's clear to me that reconciliation with the parents is not something, a goal of [CYFD] in the [PPLA].
>
> . . .
>
> There's no duty on the part of [CYFD] to support reconciliation with the parents at this point and I find that as a fact.

{11} At the last of the three hearings on September 9, 2003, the district court ruled that the proposed placements would be inappropriate in light of the therapeutic relationships between Gay and Jennifer and the children. The court entered its findings of fact and conclusions of law and decision on November 3, 2003 (Placement Order). In part, the district court found that Gay and Jennifer, who were both licensed clinical counselors, served as therapists for Julia and Rachel while they lived at Casa Mesita Group Home. Because of the patient-therapist relationships that formerly existed, the court determined that the proposed placements would constitute "dual relationships," which are prohibited by the code of ethics that governs clinical

9

counselors in New Mexico. Accordingly, the court concluded that the proposed placements constituted an abuse of discretion and would not be permitted.

{12} Because Julia and Rachel could not be placed with the Farleys and Schmierers as a result of the Placement Order, CYFD placed them with Martin and Jeanne Ritter. However, on April 27, 2004, during the annual permanency and presentment hearing, counsel for CYFD reported that because it could not find suitable foster parents for Julia and Rachel in Los Alamos, the children had transitioned into a semi-independent living arrangement in February 2004 and were renting a room from Melissa Brown and her husband. Upon inquiry from the Mercer-Smiths' attorney about the Browns, counsel for CYFD explained that Melissa Brown was the daughter of Gay and Dwain Farley, was a licensed foster parent, and had not been previously involved in the case. The district court judge responded, "So [CYFD] found a way to get around my ruling?" Counsel for CYFD apologized and stated that it was not CYFD's intent to disrespect the court or the court's Placement Order and explained that the Ritters requested that Julia and Rachel be moved because the placement was not working out as a result of transportation issues. The GAL added that she asked the daughters for the names of friends and other people that they knew who might be willing to become licensed so that they could remain in Los Alamos. While there

were many people with whom the daughters had contact in Los Alamos, it was the opinion of the GAL that because of the Mercer-Smiths' status in the community, people did not want to get involved since everyone the daughters approached had turned them down. The only people who came forward were the Farleys' daughter and her husband. Thus, the issue became whether to move Rachel and Julia from Los Alamos to find a different placement. The district court responded:

> I can't imagine [t]hat the Mercer-Smiths are [of] such status in the community . . . that there is not a family in the community that's healthy, willing and able to take care of these children. It's just truly amazing to me. I've never seen anything quite like it and find it quite disturbing, the efforts [CYFD] made to try to circumvent the decision that this court made in my decision.

{13} Three months later on July 30, 2004, the Mercer-Smiths filed a motion to initiate civil and criminal contempt proceedings. The motion named several individuals and CYFD as an entity as alleged contemnors. The Mercer-Smiths alleged that Rachel and Julia had been, for all practical purposes, placed with the Farleys and Schmierers despite the district court's ruling that doing so was an abuse of discretion. Their motion indicated that the Mercer-Smiths had hired a private investigator to observe their daughters' comings and goings from the Farley and Schmierer households and to observe their daily activities. Based on the information

gathered, the Mercer-Smiths contended that "CYFD created a sham to mask the true caretaker relationships between the girls [and] the Farleys and the Schmierers in contravention" of the district court's Placement Order.

{14} While the parties litigated the contempt proceedings, Julia and Rachel reached the age of majority and aged out of the system—Julia in 2005 and Rachel in 2006. After legal custody of both daughters ended and was no longer an issue, this case remained unresolved for almost six more years.

{15} On July 10, 2006, CYFD filed a motion to dismiss both the civil and criminal contempt proceedings. The district court entered an order on August 29, 2006, dismissing several named individuals from the contempt proceedings and ruling that criminal and civil contempt would proceed only as to counsel for CYFD and CYFD as an entity. On November 6, 2006, the district court entered an order dismissing all claims of criminal contempt. The order notes that there remain "civil contempt remedies which can be granted based on the actions of the parties."

{16} The bench trial on the civil contempt issues occurred on November 9, 2006. On January 3, 2008, the district court entered its findings of fact, conclusions of law, and order holding CYFD in contempt of court. The district court found that the Farleys had a significant and ongoing relationship with Rachel such that Rachel was

12

"placed" into their home by CYFD and the Farleys were Rachel's foster parents. Similarly, with respect to Julia, the district court found that the Schmierers had a significant and ongoing relationship with Julia such that Julia was "placed" into their home by CYFD and the Schmierers were Julia's foster parents. Accordingly, the district court concluded that CYFD's conduct was in direct violation of the court's Placement Order and held CYFD in contempt. The district court did not hold counsel for CYFD in contempt.

{17} The district court commenced a five-day bench trial to determine damages on May 31, 2011, and also held a hearing on October 19, 2011, where additional evidence and argument was considered. On December 9, 2011, the district court entered its findings of fact and conclusions of law on contempt damages. The court concluded that the Mercer-Smiths were injured by CYFD's contemptuous conduct and awarded Father damages of $616,000—$100,000 for past emotional distress, $200,000 for future emotional distress, $200,000 for loss of enjoyment of life, $56,000 for past psychological expenses, and $60,000 for future psychological expenses. Mother was awarded damages of $1,000,000—$200,000 for past emotional distress, $400,000 for future emotional distress, and $400,000 for loss of enjoyment of life. Additionally, the district court awarded the Mercer-Smiths

13

$1,859,096 in attorney fees plus $152,213 in tax and $175,826 in litigation expenses. In total, the award equaled $3,803,135.

{18} The Court of Appeals affirmed the district court's contempt order and award of damages, attorney fees, and costs. *State ex rel. Children, Youth & Families Dep't v. Mercer-Smith*, 2015-NMCA-093, ¶ 1, 356 P.3d 26. CYFD filed a petition for writ of certiorari in this Court, asserting that the Court of Appeals erred in: (1) upholding the district court's determination of contempt contrary to legal authority; (2) upholding the district court's award of emotional distress damages for civil contempt in violation of CYFD's sovereign immunity; (3) upholding the district court's decision to deem admitted two requests for admission contrary to legal authority, public interest, and the integrity of the judicial process; (4) concluding that the contempt damages are analogous to tort damages but refusing to limit the damages pursuant to the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2015); (5) not reversing the damages award based on the doctrine of unclean hands; (6) affirming the award of attorney fees, tax, and costs to counsel for the Mercer-Smiths for work performed in post-contempt proceedings; and (7) upholding a decision that is contrary to public interest. All seven contentions relate to two overarching issues that we address in this opinion—whether CYFD was

14

properly held in contempt and, if so, whether the resulting award of damages, attorney fees, and costs was proper. We granted CYFD's petition for certiorari pursuant to Article VI, Section 3 of the New Mexico Constitution and NMSA 1978, Section 34-5-14(B) (1972).

## II.      DISCUSSION

### A.      Standard of Review

{19}      Whether the district court exercised its contempt power consistent with the purposes of civil contempt is a mixed question of fact and law that we review de novo. *See Papatheofanis v. Allen*, 2009-NMCA-084, ¶ 8, 146 N.M. 840, 215 P.3d 778. Where there is an appropriate civil contempt, the sanction itself is reviewed for an abuse of discretion. *Tue Thi Tran v. Bennett* (*Tran*), 2018-NMSC-009, ¶ 30, 411 P.3d 345. "An abuse of discretion occurs when the court's ruling is clearly against the logic and effect of the facts and circumstances of the case or is based on a misunderstanding of the law." *Id.* (internal quotation marks and citation omitted).

### B.      Overview of Contempt Law in New Mexico

{20}      Courts have inherent power and statutory authority to impose remedial or punitive sanctions for contempt of court. *Concha v. Sanchez*, 2011-NMSC-031, ¶¶ 21-26, 150 N.M. 268, 258 P.3d 1060; *see also* NMSA 1978, § 34-1-2 (1851).

15

Contempts of court can be civil or criminal, and the "major factor" in determining how to classify a particular contempt "is the purpose for which the power is exercised." *Tran*, 2018-NMSC-009, ¶ 33 (internal quotation marks and citation omitted). "Criminal contempt proceedings are instituted to punish completed acts of disobedience that have threatened the authority and dignity of the court and are appropriate even after the contemnor is no longer acting contemptuously." *Concha*, 2011-NMSC-031, ¶ 26. Civil contempt, on the other hand, is remedial in nature and serves "to preserve and enforce the rights of private parties to suits and to compel obedience to the orders, writs, mandates and decrees of the court." *Tran*, 2018-NMSC-009, ¶ 33 (internal quotation marks and citation omitted).

{21} Consistent with the various purposes for which a court may exercise its contempt power, a court may impose punitive sanctions for criminal contempt, remedial sanctions for civil contempt, or both. The court may not, however, impose criminal penalties on a person who has not been afforded the protections of the criminal law, "'including the requirement that the offense be prove[n] beyond a reasonable doubt.'" *Concha*, 2011-NMSC-031, ¶ 26 (quoting *Hicks v. Feiock*, 485 U.S. 624, 632 (1988)); *cf. id.* ("[C]riminal contempt is a crime in the ordinary sense; it is a violation of the law." (internal quotation marks and citation omitted)). Acts

16

that constitute criminal contempt can take a variety of forms, including (1) any sort of disturbance that "actually obstructs or hinders the administration of justice or tends to diminish the court's authority," (2) "misconduct of court officers," and (3) disobedience of an order of the court. Rule 1-093(B)(1) NMRA.

{22} "Civil contempt sanctions may be imposed by honoring the most basic due process protections—in most cases, fair notice and an opportunity to be heard." *Concha*, 2011-NMSC-031, ¶ 25. If a court is exercising its civil contempt power, it may impose compensatory sanctions or coercive sanctions, as both are remedial in nature. *Tran*, 2018-NMSC-009, ¶ 35. "Compensatory sanctions may include damages or attorney's fees and are imposed for the purpose of compensating a party for pecuniary losses sustained due to the contempt." *Id.* ¶ 36; *see also State ex rel. Dep't of Human Servs. v. Rael*, 1982-NMSC-042, ¶ 6, 97 N.M. 640, 642 P.2d 1099 ("With civil contempt, remedial punishment for the benefit of the plaintiff is measured in some degree by the pecuniary injury caused by the acts of disobedience." (internal quotation marks and citation omitted)). "Coercive sanctions may include fines, imprisonment, or other sanctions designed to compel the contemnor to comply in the future with an order of the court." *Tran*, 2018-NMSC-009, ¶ 37 (internal quotation marks and citation omitted). "Because the purpose of [this type of] civil

17

contempt sanction[] is to compel compliance with the court's orders and not to punish, the continuing contempt sanctions end when the contemnor complies." *Concha*, 2011-NMSC-031, ¶ 25.

**C.      The District Court Did Not Exercise Its Contempt Power Consistent With the Purposes of Civil Contempt**

{23}      The classification of contempt in this case is not based on the initiation of the contempt proceedings in the context of a civil case, the dismissal of the criminal contempt portion of the Mercer-Smiths' motion, or all parties proceeding since that time as if dealing with civil contempt. *See Tran*, 2018-NMSC-009, ¶ 34 (stating that this Court is not "bound by the parties' characterization of the contempt as civil or criminal"). Instead, as set forth above, "we look to the nature and purpose of the punishment, rather than the character of the acts to be punished, as a controlling factor." *Concha*, 2011-NMSC-031, ¶ 32 (internal quotation marks and citation omitted).

{24}      The district court awarded the Mercer-Smiths compensatory damages for past and future emotional distress, loss of enjoyment of life, and past and future psychological expenses. In support of the award, the district court found that "there continued to be viable prospects for reconciliation between [the Mercer-Smiths] and

their daughters Julia and Rachel" before the hearing that resulted in the district court's Placement Order. Additionally, the district court found that because of CYFD's contempt of the Placement Order, "the likelihood of any meaningful form of reconciliation . . . was greatly reduced to the point of being remote and effectively eliminated." Based on the district court's findings, the intended purpose of the contempt proceedings was to preserve and enforce the Mercer-Smiths' chance of reconciliation with Julia and Rachel, which was allegedly undermined by CYFD's violation of the Placement Order. However, at the time that the contempt proceedings were initiated, the district court had already "accept[ed] . . . as an uncontroverted fact" that CYFD had "no duty . . . to support reconciliation." Thus, as we explain in further detail below, because efforts toward reunification and reconciliation were no longer being required by the district court, the contempt proceedings were not, in fact, instituted for the remedial purpose of preserving and enforcing the Mercer-Smiths' chances of reconciliation. Therefore, the resulting contempt order and award of damages, attorney fees, and costs cannot be upheld as a valid exercise of civil contempt power.

{25} In their motion to institute contempt proceedings, the Mercer-Smiths noted that they had objected to the proposed placements with the Farleys and Schmierers on

19

three grounds: first, that placing their daughters with Gay and Jennifer would result in "dual relationships" in violation of ethics rules that bind counselors and therapists; second, that the Farleys and Schmierers were not supportive of the Mercer-Smiths' attempts to achieve reconciliation with their daughters; and third, that the possibility of future reconciliation would be undermined by the placement. The district court's Placement Order reflects its findings that the placements would constitute dual relationships as contemplated by relevant ethics rules. However, the district court made no findings indicating that the placements were inappropriate for any other reasons, including that they might undermine future prospects for reconciliation between Julia and Rachel and the Mercer-Smiths. In fact, although the Mercer-Smiths tendered proposed findings based on its arguments that the proposed placements would undermine reconciliation, the district court refused them. The court's refusal to adopt these particular findings is tantamount to a finding against the Mercer-Smiths on those issues. *Jones v. Beavers*, 1993-NMCA-100, ¶ 18, 116 N.M. 634, 866 P.2d 362; *see also Sanchez v. Mem'l Gen. Hosp.*, 1990-NMCA-095, ¶ 33, 110 N.M. 683, 798 P.2d 1069 ("[R]efusal of a requested finding has the legal effect of a finding against the party who submitted the request."). Therefore, the district court's subsequent ruling that CYFD's violation of the Placement Order resulted in

20

the loss of the Mercer-Smiths' chances of reconciliation was an abuse of discretion and cannot be sustained.

{26}    Additionally, by the time that the Placement Order was entered, the treatment plan in place, which was approved by the district court, no longer required Julia and Rachel to have any contact whatsoever with their parents via visitation or family therapy. In fact, the treatment plan required no action at all with respect to either Father or Mother, except for the requirement that they pay child support. In August 2002, prior to approving that treatment plan, the district court had already changed the permanency plan from reunification to PPLA and ordered additional therapy sessions between Julia and Rachel and Mother for the purpose of attempting to resolve the ongoing issues between them. However, the district court apparently accepted CYFD's recommendation not to continue therapy between Father and the daughters, which is tantamount to a finding that it was not in their best interests. Subsequently, on July 1, 2003, when the annual permanency hearing took place, the therapy between the daughters and Mother had been completed and no additional therapy sessions were ordered. Testimony from Dr. Glass subsequently established that after family therapy ceased, it was clear that efforts at reconciliation had failed. By not requiring additional therapy—or any contact whatsoever—between Julia and

Rachel and the Mercer-Smiths, there was no mechanism by which reconciliation might be achieved, thus eliminating any chance of reconciliation that CYFD could have had a duty to support. In short, as of July 2003, no efforts at either reunification or reconciliation were being ordered by the district court. The district court's oral remark that there was "no duty on the part of [CYFD] to support reconciliation with the parents" at the August 19, 2003 hearing is consistent with this conclusion. Therefore, when the contempt proceeding was initiated in July 2004, it could not have been for the purpose of preserving or enforcing any chance of reconciliation that the Mercer-Smiths had—that opportunity had passed.

{27}   Because the contempt proceedings could not have been for the purpose of preserving or enforcing any right that the Mercer-Smiths had, the only other possible remedial purpose would have been to coerce CYFD into compliance with the Placement Order. *See El Paso Prod. Co. v. PWG P'ship*, 1993-NMSC-075, ¶ 28, 116 N.M. 583, 866 P.2d 311 ("[C]ivil contempts are those proceedings instituted to preserve and enforce the rights of private parties to suits and to compel obedience to the orders, writs, mandates and decrees of the court[.]" (emphasis, internal quotation marks, and citation omitted)). It is clear, however, that coercion was not the intended purpose either. When the district court learned at the April 27, 2004 hearing that

Julia and Rachel had been placed with Melissa Brown, the court expressed its disappointment that CYFD had "found a way to get around [its] ruling" but did not order a change in placement. Even three months later, when the Mercer-Smiths moved to initiate civil and criminal contempt proceedings based on CYFD's violation of the Placement Order, the district court did not order CYFD to find an alternate placement. Instead, the district court allowed Julia and Rachel to remain in the independent living situation with Melissa Brown until they aged out of the system. Only then did the district court finally hold CYFD in contempt. It took the district court over three and one-half years to adjudicate the contempt proceedings once it was apprised of the placement in April 2004. It took another almost four years for the district court to impose a sanction for the violation of the Placement Order. Because of the inordinate amount of time that it took to adjudicate the contempt proceedings, placement of Julia and Rachel was no longer an issue and CYFD never had an opportunity to cure its non-compliance. By the time that the district court entered the almost $4,000,000 award in favor of the Mercer-Smiths, the sanction imposed could no longer be fashioned in such a way to compel CYFD to comply with the Placement Order. The time for the opportunity to impose a coercive sanction had already lapsed.

**{28}** Based on the foregoing, we conclude that the contempt proceedings in this case

were not instituted either to preserve and enforce the rights of the Mercer-Smiths or to compel obedience to the district court's Placement Order. Accordingly, the almost $4,000,000 award could not have been remedial and was, therefore, purely punitive in nature. The punitive nature of the award in this case seems obvious—once remedial sanctions were no longer available to the district court, the purpose of the award was "to punish [a] completed act[] of disobedience that . . . threatened the authority and dignity of the court." *Concha*, 2011-NMSC-031, ¶ 26. Punitive sanctions, however, can only be imposed for criminal contempt of court and only if the alleged contemnors were afforded adequate due process. *See id.* ("A criminal contempt defendant is . . . entitled to due process protections of the criminal law, . . . including the requirement that the offense be prove[n] beyond a reasonable doubt." (internal quotation marks and citation omitted)). There is nothing in the record below indicating that the district court afforded CYFD these protections once the criminal contempt portion of the proceedings was dismissed. Accordingly, the district court's contempt order cannot be affirmed as a valid exercise of civil or criminal contempt power.

{29} As we have done in the past, we remind courts of their duty to exercise their contempt powers cautiously. *Int'l Minerals & Chem. Corp. v. Local 177, United*

24

*Stone & Allied Prods. Workers*, 1964-NMSC-098, ¶ 18, 74 N.M. 195, 392 P.2d 343; *accord Concha*, 2011-NMSC-031, ¶ 30. Because the "power of a court is so broad[,]" it is "uniquely liable to abuse." *Concha*, 2011-NMSC-031, ¶ 29 (internal quotation marks and citation omitted). When the purpose for exercising the contempt power is punitive in nature, it should not be stretched to fit some sort of remedial motivation. A court should determine, from the outset, the purpose for which it is exercising its contempt power so that it can fashion an appropriate remedy. *Id.* ¶ 45 ("A judge's exercise of the contempt power must be tailored to the contemptuous conduct, exerting just enough judicial power to right the wrong; no more, no less."). The district court in this case failed to abide by these mandates.

## III. CONCLUSION

{30} The district court did not exercise its contempt power for the purpose of preserving the Mercer-Smiths' chance of reconciliation with Julia and Rachel or for the purpose of coercing CYFD into compliance with its Placement Order. Therefore, the contempt order cannot be upheld as a proper use of civil contempt power; accordingly, we reverse the contempt order. Because the compensatory damages and award of attorney fees and costs cannot stand under an improper contempt ruling, we vacate the entire award. For the same reason, we deny the Mercer-Smiths' request

25

for attorney fees incurred as a result of the proceedings in this Court.

{31}     **IT IS SO ORDERED.**

_____

**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**


_____

**JUDITH K. NAKAMURA, Chief Justice**


_____

**EDWARD L. CHÁVEZ, Justice, retired**
**Sitting by designation**


_____

**JENNIFER E. DELANEY, District Judge**
**Sitting by designation**


_____

 **JOHN J. ROMERO JR., District Judge**
**Sitting by designation**

26